William CHRISTIAN, Appellant,

v.

UNITED STATES, Appellee.

Theodore MOODY, Appellant,

v.

UNITED STATES, Appellee.

John W. CLARK, Appellant,

v.

UNITED STATES, Appellee.

Nos. 8809–8811 and 11042.

District of Columbia Court of Appeals.

Argued Feb. 21, 1978.

Decided Sept. 28, 1978.

4

Herbert O. Reid, Washington, D. C., appointed by this court, for appellant Christian.

George B. Mickum, III, and Herbert E. Forrest, Washington, D. C., appointed by this court, with whom Judith H. Bello, Allan Gates and Howard H. Stahl, Washington, D. C., were on the brief, for appellant Moody.

Francis X. Lilly, Washington, D. C., appointed by this court, and Reed L. Von Maur, Washington, D. C., with whom Burton A. Schwalb, Rodney F. Page, Douglas G. Green, Carter Strong and William R. Charyk, Washington, D. C., were on the brief, for appellant Clark.

John W. Polk, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Henry F. Schuelke, III, and Percy H. Russell, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, GALLAGHER and YEAGLEY, Associate Judges.

PER CURIAM:

On August 15, 1973, seven individuals were each indicted by a grand jury on twenty-three counts of murder, assault, robbery, burglary, and conspiracy to commit the substantive offenses.[1] The charges arose out of events culminating in the deaths of seven persons at 7700 16th Street, N.W., on January 18, 1973. The ghastly crimes committed there came to be known collectively as the "Hanafi" case because all

1. The named defendants were William Christian, John Clark, Theodore Moody, John Griffin, James Sinclair, Ronald Harvey and James Price. The indictment also named Thomas Clinton as a co-conspirator, but not as a defendant. He died five weeks before the indictment was returned.

of the victims were Orthodox Hanafi Muslims. Five of the seven defendants were jointly tried.[2]

After a lengthy and rather complex trial[3] the jury found appellants William Christian, John Clark and Theodore Moody each guilty of seven counts of first-degree premeditated murder, seven counts of first-degree felony murder, two counts of assault with intent to kill while armed, one count of armed robbery, three counts of attempted robbery while armed, one count of first-degree burglary while armed and one count of conspiracy.[4] Motions for a new trial were filed on behalf of appellants and denied. They were sentenced to life imprisonment on each of the premeditated murder counts, those sentences to run consecutively to one another, but concurrently with all other sentences; to life imprisonment on each of the felony murder counts, those sentences to run consecutively to each other, but concurrently with all other sentences; to life imprisonment on each of the remaining substantive counts; and to one to five years' imprisonment on the conspiracy count.[5]

We begin with a summary of the government's evidence introduced at trial against all three appellants (Part I). The facts will be developed more fully, *infra*, as we discuss the individual arguments raised on appeal. Appellants jointly contend (1) they were denied their Fifth and Sixth Amendment rights by the presence of an informant (codefendant Price) in the defense camp (Part II); (2) the trial court erred in denying their motions for severance (Part III); and (3) the court erred in failing to grant a mistrial after the emotional outbursts of several prosecution witnesses (Part IV). Clark challenges the admissibility of the in-court identification of him by Amina Khaalis (Part V) and, together with Christian, claims the evidence was insufficient to support his conviction (Part VI). Clark and Moody contend the Interstate Agreement on Detainers mandates the dismissal of their indictments with prejudice (Part VII). They also assert certain evidence should not have been admitted at trial because it was obtained through unauthorized process (subpoenas and writs of habeas corpus) (Part VIII). Finally, appel-

2. One of the defendants, Ronald Harvey, was a fugitive at the time of this trial. He was later tried separately and convicted. His appeal from that conviction was dismissed as a result of his death. *Harvey v. United States*, D.C. App., 385 A.2d 36 (1978). Prior to trial, the government's motion to sever James Price from the other defendants was granted.

3. The trial lasted approximately three months. The government's case alone consumed almost fifty days during which more than one hundred witnesses testified and over five hundred exhibits were introduced.

4. D.C.Code 1973, §§ 22–2401, –501; –3202, –2901; –3202, –2902; –3202, –1801(a); –3202, –105a, respectively.

 Another codefendant, John Griffin, also was convicted on all counts; however, the trial court granted his motion for a new trial on the grounds of prejudicial joinder. This court, petitioned by the government for a writ of mandamus, found that the trial court had granted that motion on grounds not raised by the defendant. We held that the court had exceeded its jurisdiction and that its order was ineffective, and we remanded for sentencing. *United States v. Braman*, D.C.App., 327 A.2d 530, 535 (1974), cert. denied sub nom. *Griffin v. United States*, 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405

(1975). Later, the trial court again granted Griffin's motion for a new trial on the grounds of newly discovered evidence. The newly discovered evidence was the testimony of the sole surviving, competent witness to the offenses, Ms. Amina Khaalis, at the trial of codefendant Harvey. In her testimony she confused Griffin with codefendant Price in connection with the particular role of one of the murderers. *United States v. Griffin*, D.C.Super.Ct. (Cr. No. 47902–73, Mar. 19, 1975, slip op. at 8). At his third trial, Griffin was acquitted. *United States v. Griffin*, D.C.Super.Ct. (Cr. No. 47902–73, Nov. 5, 1977).

 At the close of the government's case, the court granted a motion for judgment of acquittal on all charges as to the seventh defendant, James Sinclair.

5. Sentences on each of the two counts of assault with intent to kill while armed are to run consecutively to each other, but concurrently with all other sentences; on each of the three counts of attempted robbery while armed, sentences are to run consecutively to each other, but concurrently with all other sentences; the sentences for armed robbery, burglary while armed and conspiracy are to run concurrently with all other sentences.

lants claim error in the felony-murder instructions (Part IX).

## I.

On January 18, 1973, approximately eight armed men entered a house at 7700 16th Street, N.W., and proceeded to rob, shoot, or drown every person present. Seven persons, including five children, were brutally murdered; two others were seriously wounded.[6] The home was the residence of Calipha Hamaas Abdul Khaalis and the headquarters of the Orthodox Hanafi Muslims. The government's theory at trial was that the murders were the culmination of a conspiracy by members of the "Nation of Islam," the so-called "Black Muslims," to seek revenge against Hamaas Khaalis for his criticism of Elijah Muhammad, then leader of the Nation of Islam. Khaalis had voiced his disapproval of Elijah Muhammad in two letters sent to Nation of Islam mosques throughout the United States. In support of this theory, the government produced Amina Khaalis, the only competent surviving victim of the massacre and daughter of Hamaas Khaalis.[7] She testified at trial that during the melee, one of the intruders had questioned her as to why her father had written "those letters." Before being taken to the hospital on the day of the murders, she was able to tell police her assailants were some of "Elijah's people."

In the wake of the murders, several leads soon developed which prompted investigators to turn toward the city of Philadelphia in their search for the killers. Several pieces of evidence were abandoned by the intruders as they made their getaway: a large blue suitcase containing two sawed-off shotguns, ammunition, a copy of the Philadelphia Daily News (not sold in Washington during January 1973), credit cards belonging to a William Horton of Philadelphia,[8] and a brown paper bag from which a fingerprint of Clark's was later identified. Also discarded were three pistols, one of which was registered to a Eugene White of Philadelphia, who had previously reported it stolen in an armed robbery. Moody was subsequently identified as one of the perpetrators of that robbery. An eyewitness saw the getaway cars and recalled their Pennsylvania license plates. Found later on the escape path was a piece of paper on which was written "Brother Lieutenant John 38X." The name is of the type received by one who has joined the Nation of Islam and was, in fact, used by Clark. Clark and Christian were identified as being associated with the Philadelphia mosque.

Records of Clark's home telephone number revealed that on January 17 and 18, 1973, several calls were made between his Philadelphia home and the Downtown Motel in Washington, D.C. The motel's records disclosed that a man purporting to be William Horton had registered a party of six on January 17, 1973. Two handwriting experts positively identified Clark as the person who had forged Horton's signature. A call from the motel also was made to Christian's home in Philadelphia. One of the motel's employees identified Christian

---

6. Two of the offenders initially gained entrance to the house on the pretext of purchasing a religious pamphlet written by Hamaas Khaalis, who lived at this residence. The entrants forced three occupants at gunpoint to lie down on the floor. After placing shirts over their captives' heads, the two let into the house about five or six more intruders. Once they were inside they rounded up all the remaining occupants of the house and demanded money before taking them down into the basement. Most of the Hanafi residents were bound and had their heads covered to prevent them from seeing the intruders. Then, one at a time, three of the Hanafis were taken upstairs to various rooms and shot in the head at pointblank range; two of them died. Four of the young children were drowned—three in a bathtub together upstairs and a fourth in a washtub in the basement. Two other Hanafis were shot in other parts of the house, and one of them died.

7. She, too, had been taken upstairs alone, with her head covered and her hands bound, and shot several times in her head. Remarkably, besides surviving, she remained conscious during the entire episode.

8. Horton was not a suspect; he had been robbed of his wallet while at a party in Philadelphia. Handwriting evidence was introduced that indicated Clark had used Horton's identification card to rent a tuxedo from a store near Philadelphia.

from a photograph and again in court as one of the persons she had seen at the motel on January 18, 1973.

Other evidence showed that Moody had purchased a used Chrysler in Philadelphia on January 16, 1973. Gasoline for this car was purchased at Exxon stations in Philadelphia, Washington, D.C., and between the two cities over the next few days. Used to buy the gasoline was a stolen credit card issued in the name of Lorrene Goode. A handwriting expert testified it was "probable" that Clark was the forger of Goode's signature.[9] Further evidence indicated that Christian had used the Goode credit card in the Philadelphia area in January and February 1973.

In the spring of 1973, the grand jury investigating the Hanafi case issued subpoenas for appellants to appear in a lineup. Moody and Clark were incarcerated in Philadelphia on unrelated charges and were transferred to the District pursuant to writs of habeas corpus. When Christian was served with the subpoena, he chose to ignore it by fleeing to Florida where he (along with codefendant Griffin) was apprehended in October 1973. At the lineup, Amina Khaalis identified Moody as one of the men she had seen in the house on the day of the murders. Two eyewitnesses identified Moody as one of the individuals seen fleeing from the scene. Clark was not identified at the lineup proceedings. At trial, Amina Khaalis made in-court identifications of both Moody and Clark. Two other witnesses identified Moody at trial.

Appellants Clark and Moody presented alibi defenses. Christian produced no testimony.

## II.

All three appellants contend that their Fifth Amendment rights to a fair trial and their Sixth Amendment rights to effective assistance of counsel were violated because the presence of James Price as a codefendant in their midst up until the eve of trial constituted a governmental intrusion into the defense camp. More specifically, they argue that because James Price had given a statement to the prosecution inculpating himself and seven others (including them), and because the prosecution anticipated his testimony against them at trial, he was the equivalent of a government agent. Furthermore, they assert that because he was made a codefendant with them, housed in the same jail with them temporarily, and participated in defense discussions with appellants and their attorneys, as did his counsel, their constitutional rights to a fair trial and effective assistance of counsel were violated.[10]

At a lineup held on June 7, 1973, Amina Khaalis identified James Price as one of the perpetrators. On June 21, 1973, the prosecutors met with Price and his wife in Philadelphia to discuss an agreement to testify for the government. On June 22, Price was placed in protective custody and moved to the District of Columbia (D.C.). On July 3, he gave the prosecution a detailed statement inculpating himself and seven others, including appellants Christian, Clark, and Moody, as participants in the Hanafi murders. Two days later he affirmed his written confession before the grand jury. At the start of the grand jury proceedings, prosecutor Shuker agreed that if Price testified before the grand jury and at the trial, the government would permit him to plead guilty to two counts of second-degree murder and two counts of armed robbery. In exchange for his testimony, the government also agreed to take all possible precautions to assure the safety of Price and his family. Thus, on July 16, the Department of Justice requested that Price be provided with continued protective custody as a material wit-

---

9. "Probable" means it is more likely than not the person in question wrote the signature. Other classifications of handwriting identification are "positive," "highly probable," and "positive elimination."

10. Appellant Clark submits he is therefore entitled to reversal of his conviction. Appellant Moody contends that his conviction should be reversed and the charges dismissed. Appellant Christian requests that his conviction be set aside and either a judgment of acquittal entered or a new trial granted.

ness. Soon thereafter, the Chief Judge of the Superior Court entered a sealed order effecting Price's protective custody pursuant to D.C.Code 1973, § 23–1326. *In re English Village*, D.C.Super.Ct. (No. SP 537–73, July 24, 1973). On August 5, 1973, the grand jury returned indictments against Price, Christian, Clark, Moody, Sinclair, Griffin and Harvey.

On February 6, 1974, the government moved to sever Price from the trial on the ground that he would be a government witness. Due to this development various defendants moved, *inter alia*, to dismiss the indictments or to suppress the testimony of James Price. On February 22, the trial court heard arguments and denied the motions to dismiss the indictments or to declare a mistrial, but reserved ruling on the motion to suppress Price's testimony until it could decide whether an evidentiary hearing would be necessary.

Then, on March 26, an unexpected event occurred which changed the course of the case considerably. A motion was filed on behalf of Price by an attorney named David Pasha, whom Price had apparently first met briefly the day before.[11] This was a motion for an order to relieve Price's appointed attorneys—Farquhar and Shannon—and to permit him to retain new counsel, *i. e.*, Pasha, for the sole purpose of representing Price as a prospective witness in the case.[12] The court considered filings submitted by other parties and conducted two hearings with Pasha. Finding that Pasha had made misrepresentations as to his bar admissions in other states and due to certain unresolved conflicts of interest pertaining to his past representation both of codefendant Harvey in another jurisdiction and of Mrs. Price, the trial court denied the motion.[13]

On March 31, Price and Farquhar—still his defense counsel[14]—met with the prosecution to go over Price's prior statements and to prepare for his trial testimony as a government witness. The next day, the trial court decided that a so-called taint hearing would be necessary. The hearing lasted several days.[15]

We note at the outset the obvious significance to the government's case of testimony from a direct participant in the offenses, whose statements inculpated all involved. Except for the identification testimony of Amina Khaalis—the sole, competent survivor of the massacre—the prosecution's case was built on circumstantial evidence.[16] Ac-

---

11. In that motion a representation was made on behalf of Price that he had never given a statement to the government and had no knowledge of the substantive facts in the indictments against him or the other defendants.

12. Price apparently desired to keep Farquhar and Shannon as his defense counsel in the event of his own trial.

13. The court subsequently appointed new counsel for Price.

14. The court considered Farquhar and Shannon's role as defense counsel terminated on April 1.

15. At the taint hearings extensive examination was conducted of: prosecutors—Evans, Shuker, and Russell; defense counsel for Price—Shannon and Farquhar; Edward Forman—Warden of the Philadelphia Detention Center; Anthony Antoinetti—Deputy Warden of the Philadelphia Prison Systems, assigned to the Philadelphia Detention Center; appellant John X. Clark; Herbert Reid—counsel for defendant Christian; Mrs. Price—wife of defendant Price (because she did not return to the hearing for cross-examination by the government, the testimony she gave on direct examination was stricken from the record and we have not considered it on appeal); Floyd Arnold—Administrator of Correctional Services, U.S. Bureau of Prisons; Charles Rodgers—Assistant Director of Operations, D.C. Department of Corrections; Wayne Colburn—from the U.S. Marshal's office in D.C.; Officer Allan Harper—technician, Mobile Crime Laboratory of the Metropolitan Police Department (MPD); Detective James Greenwell—Homicide Unit, MPD; and James Price himself. Their testimony disclosed the government's relationship with Price and what transpired between them during the period following the indictment on August 15, 1973 until the government's motion to sever Price on February 6, 1974.

16. The evidence was so insubstantial against one of the codefendants, Sinclair, that after Price refused to testify and the government presented all its evidence, the trial court granted his motion for judgment of acquittal. The evidence against Griffin was not that insubstantial, but at his third trial, he was acquitted by the jury. *United States v. Griffin*, D.C.Su-

cordingly, the government had a strong interest in obtaining the cooperation of Price at trial.

The testimony of the prosecutors involved in this case revealed that the government sought continuously to arrange for adequate security measures. It encountered problems with both Price and his wife, however, in securing cooperation with its efforts to protect them.[17] Furthermore, there were problems at the institutions to which Price was sent. According to the government, most prisons found reasons to terminate Price's stay.[18] As soon as the government was able to arrange what it and Price's defense counsel considered satisfactory security arrangements, it moved to sever Price from the codefendants and deliberately alerted the remaining defendants as to Price's status. As prosecutor Evans testified:

> At the time we moved to sever was the first time that we ever, in the history of this case, had been able to work out what, for Mr. Price himself, satisfied us as a secure safe procedure with respect to his own security and the final meeting, the final workings on that were not completed until the eve of the filing of the motion in Court. In fact, as I recall it, there was some concern that everything would be in place the very day that we filed the motion, so far as Mr. Price's own security was concerned. Mr. Price, at that point, with his counsel made a judgment. He was in a dilemma as to whether—as to his situation. He decided he was going to

testify as of that time. At the same time, his wife and children were still in Philadelphia and were not in a secure situation. Again, talking to his attorneys and talking to us, convinced us that it would be safe for his family to file a motion, because nobody would believe it. He was absolutely convinced that the defendants would be convinced that he was not going to be a Government witness and he convinced us that they wouldn't believe it either, and we filed the motion. It was time—we waited, we tried our best and it was fish or cut bait time on the matter of security. . . .[19]

During the intervening period, the government was in constant contact with Price. According to the testimony of the prosecutors—Evans, Shuker, and Russell—among them they talked to Price either in person or on the telephone almost daily from the time the indictment was filed on August 15, 1973 until about the time of severance just before trial. These conversations purportedly covered a wide range of matters—including the health of his pregnant wife, the delayed receipt of mail at the various institutions, the overabundance of pork being served and many other everyday matters such as those—but principally concerned security arrangements for both him and his family.

Attorneys Farquhar and Shannon, the appointed counsel for Price, were informed of the arranged plea bargain. According to Farquhar, at the beginning of his represen-

---

per.Ct. (Cr.No.47902–73, Nov. 5, 1977). See also note 4 *supra.*

17. For example, Price testified about the government's security efforts as follows:

> They were telling me that if I was to be a government witness, you know, the result. They was telling me that they would change my identity. You know, they would move my family from Philadelphia to any place I wanted to go. You know, they was telling me like the security, the security was set up whereas nothing would happen to my family if I was to be a government witness, you know. But I was stressing to them but I knew my wife wouldn't go in for nothing like that, and I wasn't either.

As for Mrs. Price, at the time the government filed its motion to sever her husband, she was offered security arrangements, but she declined. Then, later but prior to March 27, 1974 she again requested government protection. According to prosecutor Evans, she was in a security situation on the first day of the taint hearings, April 1, 1974.

18. For example, at the Montgomery County Detention Center in Rockville, Maryland, where Price spent a considerable amount of time, he and Moody and Sinclair—who joined him there briefly—were transferred at the behest of the Detention Center's authorities, according to Evans.

19. This was not until February 6, 1974—almost six months after indictment.

tation of him, Price denied ever having made any statement, although he never repudiated his confession in the presence of any government representatives. Eventually Price discussed the government's offer and his prior statement with Farquhar, but neither Farquhar nor Shannon were ever convinced that Price would actually testify at trial. Consequently, they worked on the assumption that he would not testify, but would remain a defendant with the need for the full complement of defense trial strategy and tactics. While thus working on behalf of Price, they maintained the secrecy of Price's status—in order not to jeopardize either his life or the future performance of his plea bargain.

The prosecutors all testify that they had instructed Price and his attorneys from the beginning of their meetings not to reveal any information learned from other defendants or their counsel, nor to disclose any defense strategy or tactic. Price, Shannon and Farquhar agreed not to disclose any such information received after August 15, 1973—the date of indictment. The prosecutors all testified that they never received any information from Price or his attorneys, except concerning an inquiry as to the whereabouts of codefendant Ronald Harvey—still a fugitive wanted for this same series of offenses. Shannon testified that he never learned anything from the other defendants or their attorneys and did not pass along anything to the prosecution—nor to his knowledge did Price. Farquhar testified that there were never any conversations concerning matters learned by Price after the date of indictment at the meetings he attended with Price and the prosecutors. Farquhar also instructed Price, before being placed in prison with any codefendants, not to discuss the merits of his or their cases. He also said that he never passed any defense information along to the government at all, nor to his knowledge had

Price. Price also testified that he never disclosed any information he learned after the indictment was filed—not even including anything relating to Harvey or his whereabouts. He acknowledged that the prosecution had specifically told him never to divulge any information which he learned from other defendants or their attorneys after the date of indictment.

During the period between arraignment and February 6, 1974, defense preparation proceeded and many motions were filed individually and jointly by the defendants. According to testimony elicited at the taint hearing, there were only two occasions when Price's counsel engaged in any form of joint defense strategy discussions. Farquhar testified that he had attended two meetings with other defense counsel: one around September 21 at defense attorney Wolf's office and the other about three weeks later. At both meetings motions were discussed. The record does not reveal what transpired at the first meeting, but at the second there was some debate as to whether to file a motion to sequester the jury. There was some division among counsel for the various defendants on this issue, but Farquhar successfully argued in favor of such a motion. Also mentioned at that meeting or shortly after in an informal conversation between Farquhar and one of the other defendant's counsel was the probable nature of the common defense being alibi. There was, however, no mention of any alibi witnesses' names.[20]

Price, upset both at being singled out by always being jailed separately from his codefendants [21] and about newspaper articles concerning his statements to the government, insisted on being housed with some of his codefendants. Furthermore, he wanted to be returned to Philadelphia to see his family, to consult with his attorneys about

---

**20.** Farquhar also came into contact briefly with codefendants Griffin and Christian, in the District Court cellblock, while waiting for Price to appear. Their only conversations concerned the timing of the next status call and one of the codefendant's desire to get back to Philadelphia.

**21.** From July 25, 1973 until either November 5 or 15 he was housed alone at the Montgomery County Detention Center in Rockville, Maryland.

other pending cases there, and to join his Muslim brothers for solidarity. Price told the prosecutors and his defense counsel that he would have no security problems, because his "brothers" would not believe the newspaper articles—which he wanted a chance to explain in person were wrong.

The prosecutors and Price's own defense counsel were adamantly opposed to Price's being housed with any of his codefendants—for security reasons. It was due only to Price's continued insistence on such a transfer and his concern that his family might be endangered if he continued to be singled out from the others that his counsel and the government agreed. Consequently, Moody was transferred to the Rockville facility, where Price was housed, from November 15 until December 4 and Sinclair was transferred there from either November 5 or 16 until November 29. All three men were then simultaneously in the same cellblock for about two to three weeks. In late December 1973, Price was transferred—again at his behest, overriding objections of the prosecution—to the Philadelphia Detention Center. Although prison officials there discussed potential security problems with Price, he insisted none existed and that he wanted to be placed with the general prison population—not segregated—and he accordingly signed a prison waiver to this effect. He specifically told the prison officials not to worry about his safety around appellant Clark. Meanwhile, Clark, who had arrived there the same day, made a specific request to be housed with Price, and the two ended up together for about ten days. The prosecutors did not learn that Clark was at that facility until after Price had arrived. Price's defense counsel did not find out until even later. There was no further physical contact between Price and his codefendants before trial.

At the conclusion of the hearings, the trial court denied the motion to suppress. Consequently, James Price was called to the witness stand on April 17. He refused to testify despite having been provided with limited use immunity. The court held him in contempt but Price never testified.[22]

In denying the motion to suppress, the trial court stated it would issue detailed findings and conclusions in the event Price testified for the government at trial. But this, as we have stated, did not occur.

It is appellants' position, essentially, that their constitutional rights to a fair trial and effective assistance of counsel were violated by the prosecution's deliberate intrusion into the defense camp of a "sham defendant" who was actively cooperating with the government. This argument does not withstand close analysis and, as we shall see, it is somewhat overdrawn.

We think the recent opinion of the Supreme Court in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), delineates the controlling legal principles applicable to the suppression motion. Plaintiff Bursey was convicted in a state court of malicious destruction of property. He later brought suit for violation of his constitutional rights to a fair trial and to effective assistance of counsel because of the intrusion by a government agent (Weatherford) into pretrial conferences between plaintiff and his attorney. Plaintiff Bursey and Weatherford, with two others, had vandalized a Selective Service office and Weatherford advised the police of the incident. In order to preserve his undercover status, Weatherford was arrested and charged along with Bursey, and retained an attorney as did Bursey. On two occasions prior to trial Weatherford met with Bursey and the latter's attorney and the approaching trial was discussed. On neither occasion was the meeting initiated by Weather-

---

**22.** Two of his codefendants, Griffin and appellant Moody—along with another person not connected with this case—murdered Price in the Holmesburg Prison in Philadelphia on December 29, 1974. *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442, 451 (1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 3143, 57 L.Ed.2d

1160 (1978). Price was being held there pending prosecution on other charges. His trial for the murders in this case was scheduled for February 5, 1975. See *United States v. Griffin*, D.C.Super.Ct. (Cr. No. 47902–73, Mar. 19, 1975) (Memorandum Op. at 8 n. 20).

ford. He was never asked if he was an informer and never stated he was not.

Weatherford did not discuss at any time with his superiors or the prosecutorial staff any information regarding plaintiff's trial plans or anything related to the criminal action. He had not expected to be a witness and the prosecuting attorney had not asked him to testify. He so stated at the second meeting with Bursey and the attorney. Before trial he lost his effectiveness as an agent, however, and due to a last minute decision he testified at the trial. He gave an eyewitness account of the incident. He did not testify concerning his conversations with Bursey and his attorney. After his conviction, Bursey filed a civil action alleging that Weatherford had communicated to his superiors and the prosecutor defense strategies and plans learned at the meetings, thereby depriving him of his constitutional rights.

The Supreme Court stated that the government had a legitimate interest in preserving the undercover status of the government agent and the agent was not required to unmask himself because he had overheard, without communicating, confidential communications between the codefendant and his attorney; and the government was not required to disclose the identity of the agent. The Court concluded:

> This is not a situation where the [government's] purpose was to learn what it could about the defendant's defense plans and the informant was instructed to intrude on the lawyer-client relationship or where the informant has assumed for himself that task and acted accordingly. . . . Weatherford went, not to spy, but because he was asked and because the State was interested in retaining his undercover services on other matters and it was therefore necessary to avoid raising the suspicion that he was in

fact the informant whose existence . . . [the defendant and his attorney] already suspected. [429 U.S. at 557, 97 S.Ct. at 844.]

The Court went on to say:

> Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise; had any of the [State's] evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case. [*Id.* at 554, 97 S.Ct. at 843 (footnote omitted).]

The Court held that "there being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by [the agent],"[23] there was no Sixth Amendment violation.[24]

■ There is no record support for the proposition, advanced by appellants, that Price was a "sham defendant." He was indicted along with six codefendants. The government's evidence and his own confession showed he participated in the murders. We do not understand this to be in controversy. Shortly before trial, upon government motion, he was severed from the joint prosecution on the ground he would be called as a government witness. Because he later refused to testify, his case was set for trial but he was murdered while in prison in Pennsylvania before his trial occurred.[25] We see no basis whatsoever to conclude he was a "sham defendant."

Appellants are most insistent that there was deliberate intrusion of Price into the

---

**23.** 429 U.S. at 558, 97 S.Ct. at 845.

**24.** The Court also held that there was no due process violation as the government had no duty to reveal the names of undercover agents and there is no constitutional right to discovery. *Id.* at 559–61, 97 S.Ct. 837.

**25.** As stated previously, see note 22 *supra*, appellants Moody, Griffin, and another were convicted of the killing. Brief for Appellee at 21 n. 15; *see also Commonwealth v. Moody, supra.*

defense camp. To support this they assert that Price and his counsel were "permitted by the government to participate with defendants and their counsel in their joint defense." [26] To illustrate this, they assert that the opportunity and invitation for such participation were originally created by the government "when it allowed Price to be jointly indicted with defendants." [27] Pyramiding on this, they argue that the opportunity for comingling was successfully promoted by the government when it opposed a joint defense motion for severance. Absent the government's opposition, the joint motion might have been granted making "cooperation and consultation between defendants and their counsel unnecessary and inadvisable." [28] To demonstrate further, appellants point to at least two occasions during pretrial proceedings when the government represented that it would offer no incriminating statements which would create a Bruton [29] problem. Consequently, appellants conclude the prosecution misrepresented that no codefendant had made an incriminatory statement when the fact was that Price had made such statements to the prosecution and the grand jury. [30] Moreover, they argue that because Price was incarcerated and ostensibly not engaged in any covert activity, the government had no reason to keep his cooperation secret until trial. Appellants question the government's asserted justification for secrecy on the ground it was necessary to protect the security of Price and his family prior to trial. [31] In short, it is contended that the government's conduct in relation to its then prospective government witness (an eyewitness to the killings) constituted a deliberate intrusion of him into the defense camp.

Appellants' argument tends to ignore salient facts of which they were aware long before the government moved to sever Price as a material witness. Even prior to arraignment, it was published in the Philadelphia press (the home area of appellants) that Price had given incriminating statements and might be a government witness

26. Brief for Appellant Moody at 16.

27. Id.

28. Id.

29. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In that case the Supreme Court was concerned with the denial of a defendant's Sixth Amendment right to confront witnesses against him when his codefendant's extrajudicial confession was introduced into evidence at trial, without the codefendant taking the stand and thus not being subject to cross-examination. Here, the government indicated that it "never intended to introduce Price's written confession but hoped to have Price testify as a live witness. Thus there was no expected Bruton problem and no misrepresentation." Brief for Appellee at 37 n. 22. If its expectations were to be fulfilled, no Bruton problem would have existed, because Price would have taken the stand and been subject to cross-examination by the other defendants. See Nelson v. O'Neil, 402 U.S. 622, 628–30, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); California v. Green, 399 U.S. 149, 163–64, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). If, however, Price had reneged on the plea bargain, and refused to testify (as in fact happened), a Bruton problem would have occurred only if the government attempted to introduce his prior confession into evidence at appellants' trial. The law on this subject is so well-established there is scarcely reason to believe the government was being disingenuous in disclaiming a Bruton problem.

30. Appellants go on to point out that the Chief Judge of the trial court upon government request entered a sealed order effecting protective custody for Price as a material witness, and shortly thereafter the indictment in this case was returned. Thereby, say appellants, the Chief Judge of the Superior Court received actual notice that Price was a prospective and intended government informer and witness against appellants. We are unable to fathom what it is that another judge—not the trial judge—who enters such an order is expected to do with this particular gleaned knowledge. We see no significance in this facet of appellants' argument. This scarcely indicates deliberate government intrusion. We might add that the trial judge stated in this proceeding that his knowledge of the case was restricted to the public record.

31. Appellants contend that at the so-called taint hearing, which lasted several days, they were not permitted to probe critical lines of questioning on the ground they might jeopardize Price's security. Our review of the record discloses, however, that later in the hearing they were given reasonable latitude in this exploration, and pursued it.

in the forthcoming trial.[32] Later, a statement to this effect appeared in the Washington, D. C. press.[33] As a matter of fact, during the pretrial period a defense attorney asked a government counsel point-blank whether defendant Price would testify for the government, and government counsel said he would not comment.[34] Beyond this, Price was detained separately from the other defendants for most of the pretrial period.[35]

It can hardly be realistically maintained that during this period Price was a secret informer intruded into the defense camp. Only the uninitiate would so view him. In fact, Price testified during the taint hearing that on two separate occasions before trial he and certain of his codefendants were housed together in the same prison at his own request. At those times he attempted to convince "his brothers" that he would not testify against them—that the newspaper stories about him as an informer were lies. Price's later actions confirmed the truth of at least some of his protestations: at trial he refused to testify against them. If Price was a secret informer, it was an open secret.

■ In light of the Supreme Court's opinion in *Weatherford, supra,* we conclude appellants' arguments must be rejected. In *Weatherford* the facts were even less favorable to the government than they are here. In addition to actively participating in the crime for which Bursey was prosecuted, Weatherford was an undercover agent employed by the state. Price's status, vis-a-vis the government, was not the same. Besides his initial pretrial statements to the government and the grand jury, there is no evidence showing any further cooperation or collaboration with the government. Furthermore, the Supreme Court considered it crucial that the trial court expressly found Weatherford did not communicate "'any details or information regarding . . . [Bursey's] trial plans, strategy, or anything having to do with the criminal action pending against . . . [Bursey].'" *Weatherford, supra,* 429 U.S. at 548, 97 S.Ct. at 840 (quoting from the trial court's unpublished opinion).[36] Nor did Weatherford testify at trial as to any conversations with Bursey and his attorney. Here, too, the trial court expressly found that there was "no disclosure of any communications obtained from the defense or defense attorneys to the Government."[37] We see no reason to upset this finding. Moreover, unlike Weatherford, Price never testified at trial. Finding the principles articulated by the Supreme Court in *Weatherford* controlling, we conclude that there was no violation of appellants' Sixth Amendment rights, because there was "no tainted evidence in

---

32. According to the testimony of Farquhar, this article appeared in the Philadelphia newspaper on August 10, 1973.

33. Shuker testified that this appeared in a local newspaper around September 1973.

34. Farquhar and Shannon were also both asked the same question. Farquhar refused to comment, and Shannon responded that as far as he knew Price would not testify.

35. The record also shows that, apparently feeling compelled to do so as an advocate, counsel for Price filed a *Miranda* motion pretrial (*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) to suppress any incriminating statements by his client. Additionally, a defense counsel proposed a voir dire question for prospective jurors relating to their reaction if a codefendant testifies against another defendant.

36. For example, the Supreme Court, in discussing the facts of *Bursey* stated, "[i]f the fact was, as found by the District Court, that *Weatherford communicated nothing about the two meetings to anyone else,* we are quite unconvinced that a constitutional claim under the Sixth and Fourteenth Amendments was made out." 429 U.S. at 556, 97 S.Ct. at 844 (emphasis added). Furthermore, "[a]s long as the information possessed by Weatherford remained uncommunicated, he posed no substantial threat to Bursey's Sixth Amendment rights." *Id.* Again to the same effect the Court said, "unless Weatherford communicated the substance of the Bursey-Wise [his counsel] conversations and thereby created at least a realistic possibility of injury to Bursey or benefit to the Government, *there can be no Sixth Amendment violation." Id.* at 558, 97 S.Ct. at 845 (emphasis added).

37. Significantly, three defense attorneys agreed there was no evidence of such disclosure.

this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by [a government agent] . . . ." 429 U.S. at 558, 97 S.Ct. at 845. *See United States v. Kilrain,* 566 F.2d 979, 982–83 & nn. 4–8 (5th Cir. 1978); *Klein v. Smith,* 559 F.2d 189, 197–200 (2d Cir.), *cert. denied,* 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977); *Mastrian v. McManus,* 554 F.2d 813, 821 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977); *Pobliner v. Fogg,* 438 F.Supp. 890, 891–94 (S.D.N.Y.1977).[38]

■ The trial court's finding that there were no communications regarding information obtained from the "defense or defense attorneys" precludes any argument of substance that either tainted evidence was obtained and used at trial or defense strategy was disclosed to the government. Furthermore, there is less reason to conclude that there was purposeful intrusion by the government here—"to learn what it could about the defendant's defense plans . . . ."[39]—than in *Weatherford.* The prosecution indicted Weatherford with Bursey in order to protect the former's undercover status for further use in criminal investigation—a justification that the Supreme Court did not disapprove. 429 U.S. at 557, 97 S.Ct. 837. Here, the government had an even more significant justification for indicting Price with the others—to safeguard the lives of Price and his family. *See also Klein v. Smith, supra* at 198. Unlike *Weatherford,* however, Price could not be severed from the other defendants without

immediately confirming his status as a prospective government witness and thus endangering his and his family's lives—until such time as adequate security measures could be arranged. We do not think this is the type of intrusion considered fatally purposeful in *Weatherford.*

Appellants argue, however, that even if these facts do not fall within the proscribed areas of intrusive activity outlined in *Weatherford,* the continued validity of the per se rule—applied to extremely offensive government conduct—requires reversal, citing *Coplon v. United States,* 89 U.S.App. D.C. 103, 191 F.2d 749 (1951), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952), and *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879 (1953), *cert. denied,* 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1260 (1955), as being controlling decisions in this jurisdiction. There has not been here, however, "an offensive interference with . . . [defendants'] rights without any justification." *United States v. Gartner,* 518 F.2d 633, 637 (2d Cir.), *cert. denied,* 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975); *see Klein v. Smith, supra* at 199–200. Morally shocking conduct is not present as in *Coplon* (involving interceptions by government agents of telephone conversations between the defendant and her attorney before and during trial) and *Caldwell* (government undercover agent working as an assistant for the defense and reporting frequently to the prosecution on many matters connected with the trial).[40]

---

**38.** All four of these decisions were rendered in light of the Supreme Court opinion in *Weatherford.*

**39.** 429 U.S. at 557, 97 S.Ct. at 844.

**40.** Although appellants describe the role of Price in this case as a sinister one manipulated by the government, when we cut through appellants' charges, we find that Price was a codefendant who agreed—at least tentatively— to testify for the government in return for dismissal of some charges upon a plea of guilty to lesser ones and made an eyewitness statement to both the prosecution and the grand jury. Secrecy in order to protect his security as a potential government witness was a genuine concern. That it should have been was later demonstrated by his murder at the hands of

some codefendants. His court-appointed attorneys thought the plea bargain struck was in Price's best interests. The prosecutors stayed in continuous personal communication with him as both they and his own attorneys considered his agreement to testify as tentative. Put simply, Price was potentially a very important government witness in an upcoming mass murder trial where government evidence was not abundant, and the government sought to take reasonable means in an effort to insure that he would testify at the trial. His testimony as a participant would have been devastating if accepted by the jury. In the field of criminal prosecution there is nothing very extraordinary about a situation such as this.

Although the relationship may be considered to have touched defendants through Price, it did not become a fatal intrusion.[41] This record does not disclose spying by the government upon attorney-client communications. Nor, realistically viewed, does it reveal the presence of a spy. Price's status can hardly be called a secret to the other defendants and their counsel.

Having concluded there was no Sixth Amendment violation, we consider briefly appellants' argument that their Fifth Amendment rights were violated. Their reliance on the Fifth Amendment appears also to stem from *Coplon* and *Caldwell*.[42] Appellants' arguments on the Fifth Amendment violation are not segregated from the Sixth Amendment claim. Thus, any due process violation would effectively come from the same actions of the prosecution that we have already discussed. Again, the Supreme Court's opinion in *Weatherford* provides guidance.

Here, appellants' arguments are essentially the same as Bursey's—*viz.*, that the prosecution deprived them of their due process rights to a fair trial by not disclosing to them sooner that Price was a prospective government witness. An important distinction between *Weatherford* and this case is that Price never testified and therefore whatever capacity he had for being a surprise witness or providing unexpected evidence was extinguished. The prosecution always intended to call Price as a witness, unlike the informant in *Weatherford,* but the record reveals continuing uncertainty on the part of both the prosecution and Price's counsel as to whether he would actually testify when the time came.[43] Furthermore, there was definite suspicion on the part of at least some defense counsel that Price would be called as a government witness. In any event, the Supreme Court indicated that the due process clause would not be violated "where the informer is sufficiently trusted that he is never suspected and never asked about the possibility of his testifying but nevertheless surprises the defendant by giving devastating testimony . . . ." *Weatherford, supra* 429 U.S. at 560, 97 S.Ct. at 846. The potential for prejudice would only occur where the informer testifies. If he does not, as Price did not, the deliberate nondisclosure of his anticipated role as a witness would appear to present no due process problems.[44]

We conclude that appellants have failed to establish the existence of a Fifth or Sixth Amendment violation. Consequently, we affirm the trial court's action in declining to dismiss the indictment.[45]

### III.

As we have previously noted, appellants and four others were jointly indicted. All of the charges in the indictment were alleged to have arisen out of the same series

---

41. We note, however, that in view of the delicate situation regarding Price, the government must have realized there was a risk that it could grow into a fatal intrusion constitutionally. Consequently, the government should have maintained records of its communications with Price, and should have had his counsel present during those communications invariably rather than occasionally.

42. In *Coplon, supra* at 111, 191 F.2d at 747, the court considered a claim that the defendant's constitutional right to effective assistance of counsel had been denied in light of both the Sixth Amendment and the Fifth Amendment, because part of an accused's Fifth Amendment due process rights includes "effective" assistance of counsel. *Coplon* controlled *Caldwell, supra* at 357, 205 F.2d at 881.

43. Like Weatherford, apparently Price and one of his counsel did represent to some defendants and their counsel that he would not testify at trial. However, the prosecution and Price's then defense counsel, when asked about this, refused to comment.

44. We discussed this aspect previously in the context of Sixth Amendment issues.

45. We see no reason to grant a new trial as some appellants would have us do.

· We also note that the trial court's ruling after the taint hearing was on a motion to suppress Price's testimony. An appeal from the decision not to suppress his testimony would, of course, be moot in light of Price's refusal to testify. Consequently, we have treated this appeal as relating to his ruling on the alternative motion to dismiss the indictment.

of acts or transactions. Therefore, the initial joinder of defendants was appropriate under Super.Ct.Cr.R. 8(b). Both prior to and during trial, appellants requested that the trial court order separate trials under Super.Ct.Cr.R. 14. They now claim that the trial court erred in denying their motions.[46]

When two or more defendants are indicted on conspiracy charges growing out of the same series of transactions, or are charged with jointly committing a criminal offense, there is a strong presumption they will be tried together. *United States v. Bridgeman*, 173 U.S.App.D.C. 150, 158, 523 F.2d 1099, 1107 (1975), *cert. denied*, 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976); *United States v. Branan*, 457 F.2d 1062, 1066 (6th Cir. 1972); *United States v. Gambrill*, 146 U.S.App.D.C. 72, 83, 449 F.2d 1148, 1159 (1971). In ruling on a motion for severance, the trial court has broad discretion. *Clark v. United States*, D.C.App., 367 A.2d 158, 160 (1976); *Smith v. United States*, D.C.App., 315 A.2d 163, 168, *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). "The court must weigh, case by case, the advantage and economy of a joint trial to the administration of justice against possible prejudice to a defendant." *United States v. Donaway*, 447 F.2d 940, 943 (9th Cir. 1971). It need not order severance unless a joint trial is manifestly prejudicial. *Clark v. United States, supra; United States v. Bridgeman, supra.*

In order to reverse the trial court's denial of a motion to sever, we must find a clear abuse of its broad discretion. *Williams v. United States*, D.C.App., 382 A.2d 1, 8 (1978); *Clark v. United States, supra* at 160; *Jackson v. United States*, D.C.App., 329 A.2d 782, 787 (1974), *cert. denied*, 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975). Furthermore, appellants have the burden of affirmatively demonstrating their rights have been prejudiced by a joint

trial. *United States v. Gimelstob*, 475 F.2d 157, 160 (3d Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 62 (1973); *United States v. Kershner*, 432 F.2d 1066, 1071 (5th Cir. 1970); 1 C. Wright, Federal Practice & Procedure § 227, at 469 (1969). And, an appellate court will be extremely reluctant to reverse on grounds of prejudicial joinder when the trial court has minimized the prejudice through the efficacious use of cautionary instructions. *United States v. Laca*, 499 F.2d 922, 926–27 (5th Cir. 1974). After scrutinizing the record, we conclude that appellants have not carried their burden of showing that a joint trial so prejudiced them as to constitute an abuse of the trial court's discretion.

Appellants point to several types of prejudice to support their severance claim. First, appellants Moody and Clark contend that a substantial amount of evidence introduced at the joint trial would not have been admissible against them if they had been tried separately. For instance, Moody contends that the evidence of codefendants Christian's and Griffin's flight in May 1973, and the evidence showing Clark had rented a tuxedo under the name of William Horton in December 1972, would not have been admissible at his separate trial. It is recognized, however, that because certain evidence would be admissible against one defendant but not the others does not mean severance is required. *United States v. Harris*, 441 F.2d 1333, 1336 (10th Cir. 1971); *Caton v. United States*, 407 F.2d 367, 372 (8th Cir.), *cert. denied*, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969). In this case, appellants have not shown that they were substantially prejudiced by the evidence which would not have been admissible at their separate trials. And, on numerous occasions during the trial, where evidence relating only to one defendant was admitted, the trial court instructed the jury that

---

46. Appellants also claim that the trial court erred in failing to rule on their severance motions prior to trial. This claim is without merit. The record indicates that prior to trial, the court considered the motions and denied them "without prejudice to their being renewed." Hence, contrary to appellants' assertions, the trial court did not refuse to rule on the motions. Moreover, even if the trial court had put off ruling on the motions until it could consider them in light of developments at trial, there would be no error. *See* 1 C. Wright, Federal Practice & Procedure § 221, at 434 (1969).

it could consider the evidence only against that individual defendant.

■ Second, appellants claim they were prejudiced by the disparities in the strength and nature of the evidence introduced by the government against the various defendants. Again, their contention misses the mark. A defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than the evidence against him. *United States v. Leonard*, 161 U.S.App.D.C. 36, 47, 494 F.2d 955, 966 (1974); *United States v. De Larosa*, 450 F.2d 1057, 1065 (3d Cir. 1971), *cert. denied*, 405 U.S. 957, 92 S.Ct. 978, 30 L.Ed.2d 806 (1972). Manifest prejudice occurs only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants. *United States v. Gambrill, supra* at 83, 449 F.2d at 1159; *United States v. Donaway, supra* at 943. In this case, the record contains substantial evidence concerning the complicity of each of the appellants. The evidence against some of the defendants is not so much more damaging than the evidence against the others that severance was required.

■ Finally, appellants contend that they were prejudiced by the antagonistic positions the various defendants advanced by way of defense. The record belies their contention. At trial, each of the codefendants denied participation in the crime and three presented alibi defenses. Realizing that the defenses were not contradictory, appellants claim that the defenses were antagonistic in the sense that each defendant was forced to argue the weakness of the case against him by comparing it to the strength of the case against his codefendants. Appellants' assertion is without merit. In order for a defendant to show prejudicial joinder on the basis of a conflict in defenses, the positions advanced by the defendants must be so irreconcilable that the jury would infer guilt from this fact alone. *Williams v. United States, supra* at 8–9; *United States v. Clark, supra* at 160; *United States v. Gorham*, 173 U.S.App.D.C. 139, 143, 523 F.2d 1088, 1092 (1975); *United States v. Robinson*, 139 U.S.App.D.C. 286, 289, 432 F.2d 1348, 1351 (1970). This is not such a case.

Appellants' assertions of prejudice do not show that they were deprived of a fair trial. We therefore conclude that the trial court did not abuse its discretion in denying the motion to sever.

## IV.

Appellants collectively contend that the trial court erred in not granting a mistrial as requested after an emotional outburst on the part of Hamaas Khaalis.[47] We disagree. The incident in question occurred a short time after Mr. Khaalis took the witness stand during presentation of the government's case-in-chief:

By the prosecutor:

Q: Now, Mister Khaalis, what is your profession, at the house?

A: The Masheer.

Q: And, what does "Masheer" mean?

A: The guide, the director, spiritual advisor. The man who defends the faith. The man who knows tricksters and murders and gangsters that deviate on Islam.

Q: I'll ask you sir, now if you will direct your attention back to January 18th.

*Mr. Khaalis*: You don't have to smile, Mister. [Khaalis was apparently referring to one of the defense lawyers.]

*The Court*: Wait a moment, Mister Khaalis.

*Mr. Khaalis*: I don't want him smiling and smirking.

---

47. Appellants also contend that Amina and Khadyja Khaalis were emotional witnesses who contributed to the prejudicial atmosphere in the courtroom when they testified prior to Mr. Hamaas Khaalis. However, a review of the record leaves us unpersuaded. There was no outburst on the part of Amina Khaalis. On the contrary, it appears that she maintained her composure rather well under piercing cross-examination by defense counsel who probed her feelings toward Black Muslims. Khadyja Khaalis' display of temper was not directed at any of the appellants, but rather as the trial court observed, at one of defense counsel. This may have damaged the government's cause rather than appellants'.

*The Court*: Mister Khaalis, please. Mister Khaalis, just listen to the questions and respond to the questions. Look at Mister Evans and listen to his questions carefully and respond to the questions.

*Mr. Khaalis*: I will respond to the questions, Your Honor.

At this point, a bench conference was requested. While counsel were approaching the bench and the witness was stepping down from the stand, the record reflects the following:

[Mr. Khaalis stepped down from the witness stand.]

*Mr. Khaalis*: It's over. It's over.

*The Court*: Mister Khaalis.

*Mr. Khaalis*: You killed my babies.

*The Court*: Mister Khaalis. Mister Jones [the marshal], would you please escort Mister Khaalis to the witness room during the bench conference.

*Mr. Khaalis*: You killed my babies. And shot my women.

*The Court*: Now, Mister Khaalis, please.

*Mr. Khaalis*: They killed them.

*The Court*: Mister Khaalis, control yourself and please leave the courtroom. Leave the courtroom. (Pause)

All defense counsel, already at the bench and thus out of the presence of the jury, immediately moved for a mistrial.

The record shows that following the outburst Mr. Khaalis was removed from the courtroom, and the jury was excused. Counsel were then heard on the mistrial motion. Reconvening a short time later, the trial court instructed the jury to disregard what had just occurred and to maintain an objective state of mind consistent with their obligation as jurors.[48] Thereafter, the jury was again excused, this time for the weekend, and the trial court took the motion under advisement.

On Monday morning, the trial court announced its ruling denying the motion. The jury was then brought back and informed that the government conceded Mr. Khaalis did not know who had committed the murders. The trial court further instructed the jury as follows:

Now, ladies and gentlemen, I've stricken Mr. Khaalis' evidence on the witness stand, and the Government has conceded, —I repeat, the Government has conceded—that Mr. Khaalis doesn't know himself who perpetrated this offense. If he were asked on the witness stand whether he saw anybody in this courtroom who he saw on January 18, he would say he does not. The Government concedes this, and the Government concedes that he could make no identification at all . . . .

I instruct and I charge each of you that you are to disregard and put out of your minds any and all remarks and references which the witness, according to my ruling, unnecessarily and improperly, made with reference to any defendant. Those remarks are to form no part of your considerations and deliberations in this case and they are not to influence your verdicts in any form, any shape or any character whatsoever. Your decisions in this case must be influenced by the evidence which the Court has admitted and which the Court has not stricken. Your decisions must not be influenced by emotional outbursts of any individual, however regrettable that person's circum-

---

**48.** The court instructed the jury:

You have got to keep your minds completely pure and open, and to that end, none of you should discuss between yourselves the events that have recently occurred here.

Now, there are many who will scoff and who will say: What a useless act it is for a Court to tell a jury not to discuss something that has recently occurred in court.

I have got more faith in the jury system than that, and from what I have seen in the eight days that we have been together, I have got confidence in each one of you that you can and that you will carry out my instruction and admonition.

And I mean literally that you are not to discuss this.

I want you to go about your business for this weekend. You have got things to do. And my advice is just to forget about the case until we next see each other.

In any event, I do not want any discussion of this event, and I want to see you here Monday morning, the same conscientious jurors as we have known through these days.

stances may be. Mr. Khaalis' emotional outburst was not, and is not, evidence and cannot be a substitute for evidence. I call upon each of you to conform in every detail to the instructions which I have just given you.

 The law in this jurisdiction sheds no light on the question of the prejudicial effect of an emotional outburst in the courtroom by the victim of the offense or a member of the victim's family. In those jurisdictions which have addressed the issue, however, it is established that the determination of whether a new trial should be granted is particularly within the discretion of the trial court and will not be reversed in the absence of clear proof of an abuse. *See, e. g., Sheppard v. State*, 235 Ga. 89, 218 S.E.2d 830 (1975); *Commonwealth v. Hawkins*, 448 Pa. 206, 292 A.2d 302, 308–09 (1972); *State v. Savage*, 161 Conn. 445, 290 A.2d 221, 223–24 (1971); *People v. Carter*, 109 Ill.App.2d 15, 248 N.E.2d 847 (1969); *Uldric v. State*, 43 Ala. App. 477, 192 So.2d 736 (1966). The trial court's decision must be accorded considerable deference because that court is in the best position to evaluate the impact of the outburst on the jury. *Cf. Smith v. United States*, D.C.App., 315 A.2d 163, 167, *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974) (in considering the impact of improper remarks by the prosecutor, much reliance should be placed on the trial court's judgment).

> Unless it is clearly shown that the incident was such as would be expected to arouse the bias or prejudice of the jury, and the trial court could have, but did not sufficiently attempt to lessen its effect, the discretion of the trial court in failing or refusing to grant a new trial . . . will not be disturbed. [5 Wharton's Criminal Law and Procedure § 2175 (12th ed. 1957).]

 Despite the accusatory form of the outburst, it was, as the court said, obviously the emotional outpouring of a grief-stricken father, not in control of his faculties. Any potential prejudice from the content of the outburst was cauterized by the government's stipulation that Mr. Khaalis could not identify the men who had "shot [his] women," and "killed [his] children." Furthermore, the trial court did an exemplary job in minimizing the effect of the incident. Mr. Khaalis was immediately removed from the courtroom; and, the jury was given special instructions moments after the outburst, and again when court reconvened on the following Monday.

 The use of curative instructions in this setting weighs against a finding of an abuse of the trial court's discretion in denying a motion for a mistrial. *See, e. g., Shy v. State*, 234 Ga. 816, 218 S.E.2d 599, 605 (1975); *People v. Holmes*, 19 Ill.App.3d 814, 313 N.E.2d 297, 303–04 (1974); *State v. Savage, supra; People v. Spagnola*, 123 Ill. App.2d 171, 260 N.E.2d 20, 28, *cert. denied*, 402 U.S. 911, 91 S.Ct. 1389, 28 L.Ed.2d 653 (1970); *Uldric v. State, supra; Commonwealth v. Hawkins, supra.* We must presume, unless the contrary appears, that the jury understood and followed the court's instructions. *Burkley v. United States*, D.C.App., 373 A.2d 878, 881 (1977); *Smith v. United States, supra* at 167; *Hall v. United States*, 84 U.S.App.D.C. 209, 211, 171 F.2d 347, 349 (1948). The trial court pointed out in ruling on the mistrial motion that the jury was selected for its independence in judgment, and that the extensive voir dire examination emphasized this point. This too is a factor which may be considered in determining the effectiveness of cautionary instructions following an outburst by a witness. *See People v. Spagnola, supra*, 260 N.E.2d at 28. Finally, we note that Mr. Khaalis' outburst occurred on the fifth day of an eight-week trial.[49] Placed in this context, the potential for prejudice is further minimized as the impact must have faded with time and intervening events.

On this state of the record, we conclude the denial of the mistrial motion was not error.

---

49. Overall there were seventy-seven days between the outburst and the return of the jury's verdict.

## V.

Appellant Clark argues that "the in-court identification of . . . [him] by Amina Khaalis was so questionable and so much the product of last minute suggestiveness that it should have been excluded as a matter of law."[50] Essentially he maintains that under the totality of circumstances presented here the identification procedures used were so unnecessarily suggestive that there was a substantial likelihood of irreparable misidentification. He further contends that there is insufficient evidence to find that there was an independent source for the identification. The government responds by arguing that the "in-court identification of John Clark was not the product of an impermissibly suggestive pretrial identification; rather, it was based on an independent source, namely her [Amina Khaalis'] observations of Clark at the scene of the crime."

The murders occurred on January 18, 1973. On May 3, 1973, victim Amina Khaalis was present at two lineups. The first lineup included appellant Moody, but not Clark; the second lineup included Clark, but not Moody. At this first lineup she identified Moody and she also selected another individual—not one of the defendants—as reminding her of the person she considered the leader, i. e., Clark.[51] At the second lineup on that day she did not identify Clark, but identified another individual—not a defendant—as reminding her of the leader. At both lineups she had asked all participants to repeat certain phrases, including "this is a holdup" and "why did your father write those letters?" Although she thought that everyone repeated those phrases, in fact Clark did not. Amina Khaalis never identified John Clark before trial,[52] and thus there was no reason for Clark's counsel to move to suppress any identification evidence.[53]

At trial, the government announced that it would attempt to elicit in-court identifications from Ms. Khaalis. Clark's attorney responded that the government had the right to do so, but that it should first provide the background, e. g., the prior identification procedures, so that such procedures would not be beyond the proper scope of cross-examination by the defense attorneys. It was at this juncture Clark's counsel could have objected to any attempt by Ms. Khaalis to identify Clark on the ground now advanced for the first time on appeal. Because Clark's counsel did not so object, this contention on appeal is subject to the plain error standard of review. *Watts v. United States*, D.C.App., 362 A.2d 706, 709 (1976) (en banc); *Adams v. United States*, D.C.App., 302 A.2d 232, 234 (1973). The exercise of our authority to review alleged errors in such cases is a matter of discretion, even when a constitutional error is alleged. *See In re W.E.P.*, D.C.App., 318 A.2d 286, 289 (1974). We have exercised our discretion to note errors for the first time on appeal only when they "are obvious, affect the substantial rights of the accused and if uncorrected would be an affront to the integrity and reputation of judicial proceedings." *Harling v. United States*, D.C.App., 382 A.2d 845, 847 (1978).

---

50. Appellant Moody has adopted by reference this argument insofar as it is applicable to him.

51. Ms. Khaalis explained that one person had given all the instructions to the intruders on January 18. At trial she identified Clark as this person—the so-called leader.

52. The trial court, in an exercise of unusual caution, permitted Clark's counsel to cross-examine Ms. Khaalis concerning the pretrial identification procedures, including both the lineups and certain photographic displays.

53. The only appellant identified by Ms. Khaalis before trial was Moody, who did file a motion to suppress her identification testimony. Addressing his motion, the court ruled that: (1) the pretrial identification procedures were not suggestive; and (2) even if they were, Ms. Khaalis had an independent source of recollection for identification of Moody. Even Moody's trial counsel conceded that he could find no evidence of suggestivity present. We affirm the trial court's finding that "with respect to Ms. Khaalis there is not a scintilla of evidence showing suggestivity", and find no merit to his claim of error on appeal.

The government cites those rulings on both suggestivity and independent source as referring to Clark as well as Moody. Brief for Appellee at 54–55. Its citation is erroneous as those rulings related only to Moody.

Because we think that if appellant Clark's contention is correct—that Ms. Khaalis' in-court identification of him constituted a denial of due process—his rights to a fair trial were substantially affected, we have explored the merits of his argument.

Amina Khaalis had only seen Clark's profile for about three seconds at the time of the offense. Furthermore, at that time she was lying on her stomach on the floor with a white shirt draped partially over her head. She was then shown photographic displays on four occasions between the time of the offenses on January 18, 1973 and later that spring. She recalled that at the last of those displays she selected the photograph of a person who reminded her of the leader, but only in his coloring. She also recalled an interview with prosecutor Shuker at her home on January 29, 1973, when she provided him with a description roughly as follows: "Leader. Light-skinned, average haircut, coat tweed, green shoes, loafers with tassels, about five feet eleven inches to six feet. Only saw side view. No hair on face. No glasses." She gave a similar description of the leader in court. Ms. Khaalis also testified about the lineup procedures used on May 3, 1973, and the fact that she had not selected Clark then, but two others as reminding her of the leader. Finally, and most significantly to Clark's claim of error, she testified that although she had not seen Clark in person since the time of the offenses until February 27, 1974 in court on the day before she identified him, she had seen a photograph of the lineup in which he stood on at least three occasions prior to her in-court identification.

Clark's counsel did not object to her identification, but instead cross-examined her extensively about the circumstances surrounding it.[54] Appellant now argues that the continued showing of the photograph of

---

**54.** The pertinent portion is as follows:

Q. Miss Khaalis, again today you identified the Defendant Clark as one of the people in the house on that day, and presumably you saw him in the courtroom yesterday as well. Between those two times, January 18th, 1973, and yesterday, and today in this courtroom, had you seen the Defendant Clark in between any of those times?

A. During the time you mean I was in court?

Q. Between January 18, 1973, and yesterday, when you were in this courtroom, had you seen the Defendant Clark at any time in between those two dates?

A. He was in the lineup.

Q. And I show you Government's Exhibit 67. Is that the lineup photograph to which you are referring?

A. Yes.

Q. And is he in that lineup?

A. Number nine.

Q. And that's not the one that you picked out, is it?

A. I know. It was number six. And that's why I also had the other, the other man.

Q. So you have seen him before, but you didn't recognize him?

A. Oh, I recognized him.

Q. But you didn't pick him?

A. But I also had another one in the other lineup, and I pieced them together, because I knew that that man looked different than all of the other men I saw. Once I see a face I don't forget it.

Q. Now, I'm showing you, I think, the other lineup that day?

A. Yes, I said number nine.

THE COURT: What exhibit number is that?

MR. WOLF: Excuse me, Your Honor. That's Exhibit Number 66.

BY MR. WOLF:

Q. So you picked out number nine in that exhibit as the leader?

A. No, I didn't say he was. I said he reminded me of the leader.

Q. All right. Now, in the other photograph I take it that number nine did not remind you of the leader?

A. Oh, yes, he did.

Q. Then why did you not pick him [Clark] out?

A. Because number six reminded me more. That's why I picked out number nine, excuse me, number six, and, oh, number nine in this photo, because they were all, the three of them in these pictures, and in the lineup, all looked like the same complexion

. . . .

Q. In fact, in both of those lineups you had them turn to the left, and then to the right?

A. To the right. Yes.

Q. And so you picked out the ones whose profile reminded you most of the leader, correct?

A. Yes.

Q. And you did not pick out number nine [Clark] in the second lineup?

A. I know. Yes.

Q. Do you recall at that lineup being asked this question: "Is there anyone up there that you recognize that you saw that date?"

And then you picked out number six?

the lineup in which Clark stood constitutes, cumulatively, an unnecessarily and impermissibly suggestive identification procedure with the substantial likelihood of irreparable misidentification by Ms. Khaalis.

A. Yes, I did.

THE COURT: At which—

MR. WOLF: The second.

THE COURT: —lineup?

MR. WOLF: The second one, Your Honor, which I think is 67.

Your Honor's indulgence a moment, please?

BY MR. WOLF:

Q. Miss Khaalis, again, would you refer to Government's Exhibit Number 67? That's the second lineup, correct?

A. Yes.

Q. How many times have you seen that photograph, or a similar one?

A. I don't remember.

Q. You saw it when you testified here on February 22 [at the suppression hearing], didn't you?

A. Yes.

Q. And you saw it today?

A. Yes.

Q. And did you see it in Mr. Shuker's office at any time?

A. Oh, yes.

Q. And you saw the lineup itself, didn't you?

A. Yes.

Q. Now, you say you do recall having seen it in Mr. Shuker's office. Do you recall when that was?

A. Let me see. What is today? The 22nd [the day she testified at the suppression hearing].

Q. The same day that you testified earlier in this courtroom?

A. Yes.

Q. Did you see it in the hospital at any time?

A. No.

Q. Did you see it prior to the day that you testified earlier in this courtroom?

A. I don't remember.

Q. Does that mean that you might have?

A. I don't know.

THE COURT: I think the answer is self-evident.

MR. WOLF: Thank you, Your Honor.

BY MR. WOLF:

Q. Now, have you at any time prior to day [sic] said that number nine in there was the one that reminded you of the leader?

A. No.

Q. Today is the first time you state that, correct?

A. Today was the first time I was asked.

Q. Now, do you remember at the actual lineup itself, after, as I already stated, you were asked is there anyone up there that you recognize that you saw that date, you said number six, and then you were asked is

Although the Supreme Court has on several occasions considered claims that a witness' identification testimony should be inadmissible due to an unnecessarily suggestive identification procedure,[55] it has been

there anyone else. Do you remember replying no?

A. Yes.

Q. In other words, you did reply no, there was no one else that you saw on January 18th, 1973 in that lineup?

A. Yes.

Q. But today your testimony is different?

A. He's the man. I saw him. Number six's face is fatter. I knew the man was—his face wasn't as heavy as that. That's why I said number six and number nine in the other picture, and—yeah, number nine in the other picture. But I was still paying attention to this Clark in number nine, but I didn't want to put it on the wrong man, but he's the one. I can picture it in my mind right now.

Q. So, three and a half months after the incident occurred you would not identify him but now, more than a year later, you're sure that that's the man?

A. Yes, I am . . . .

Q. Miss Khaalis, it's a fact that during the three seconds in the hallway on January 18, 1973, all you saw of this so-called leader was his profile?

A. I saw his face, his profile, his build, everything. And his face is squarish around the cheeks, which number six isn't.

Q. And yet you picked out number six?

A. Yes.

55. As our court has observed previously,

the Supreme Court has on six occasions considered the scope of the due process protection against the admission of evidence purportedly tainted by suggestive identification procedures. Only in *Foster v. California*, 394 U.S. 440, 442–43, 89 S.Ct. 1127, 22 L.Ed.2d 402 . . . (1969) (suggestive lineup and showup) were the pretrial identification procedures found to be violative of due process. Due process attacks were rejected in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 . . . (1977) (identification from single photograph); *Neil v. Biggers*, . . . [409 U.S. 188, 201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)] (station house showup); *Coleman v. Alabama*, 399 U.S. 1, 5–6, 90 S.Ct. 1999, 26 L.Ed.2d 387 . . . (1970) (lineup); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 . . . (1968) (identification from a photographic array); *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 . . . (1967) (showup conducted in victim's hospital room). [*Cureton v. United States*, D.C.App., 386 A.2d 278, 284 n. 17 (1978).]

confronted with a situation in which the witness had identified the defendant before trial. Furthermore, in each of those cases the individual procedures used were alleged to have suggested that the witness identify the particular defendant. Here, however, there was no pretrial identification; nor was any individual showing of Clark to Ms. Khaalis—in the lineup or the lineup photographs—alleged to be suggestive. Nor has Clark alleged there was any inherent impropriety in the exhibition of the photograph in the office of the prosecutor, Shuker (or at the suppression hearing or at trial); and he has not alleged that the identification was suggested by Shuker, or any other government agent. Consequently, we are left with the following inquiry: (1) whether the exhibition of Clark to Ms. Khaalis once in the lineup and three times in the photograph of the lineup, combined with his presence in the courtroom at trial constituted, *cumulatively*, an unnecessarily suggestive identification procedure [56] and (2) if so, whether there were sufficient indicia of reliability to permit the identification testimony regardless of suggestivity. *Patterson v. United States*, D.C.App., 384 A.2d 663, 665 (1978).

"An identification is suggestive when the police conduct it in such a way that the witness' attention is directed to a particular individual as the suspect upon whom the police have focused." *United States ex rel. Goodyear v. Delaware Correctional Center*, 419 F.Supp. 93, 96 (D.Del.1976); *cf. Foster v. California*, 394 U.S. 440, 443, 89 S.Ct. 1127, 1129, 22 L.Ed.2d 402 (1969) ("In effect, the police repeatedly said to the witness, 'This is the man'."); *Anderson v. United States*, D.C.App., 364 A.2d 143, 144 (1976) (no one person in the lineup stood out); *Skinner v. United States*, D.C.App., 310 A.2d 231, 233 (1973) (no showing that

witness "was led by the police into an identification of appellant"). Thus, unless we find that the procedures used by the government in some way directed Ms. Khaalis' attention to Clark, as opposed to anyone else in the lineup photograph, as the individual to identify, there would be nothing suggestive. Ms. Khaalis saw Clark once in a lineup held on May 3, 1973, and at least three times in a photograph of that lineup during the week before she testified at trial. It seems inevitable that she would retain some image in her mind of the appearances of the persons depicted in that photograph—particularly, from the last showing, on the day of trial when she finally identified Clark. Any suggestivity present in this identification procedure stemmed directly from a combination of the image she may have formed in her mind of the lineup participants and the presence in the courtroom of only one of those participants, Clark. This procedure resulted in some suggestivity.

We must also consider the necessity for the government to have used these identification procedures. *See Mason v. United States*, 134 U.S.App.D.C. 280, 286, 414 F.2d 1176, 1182 (1969); *Kimbrough v. Cox*, 444 F.2d 8, 10 (4th Cir. 1971); *cf. Manson v. Brathwaite, supra*, 432 U.S. at 109, 97 S.Ct. 2243 (Supreme Court noting petitioner's concession that procedure was both suggestive and unnecessary). First, the lineup itself was an obvious necessity here, as in most cases, to aid the investigation of suspects. Second, the exhibition of the photograph of the lineup at the suppression hearing would ordinarily not be necessary, because no identification had been based upon it. The government introduced the photograph at that hearing, however, during its direct examination of Ms. Khaalis, the purpose not being readily apparent.[57] On that

---

**56.** A corollary question to our first inquiry is whether there was a "very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra* 390 U.S. at 384, 88 S.Ct. at 971. "Ordinarily, once unnecessary suggestiveness is found, its conduciveness to 'irreparable misidentification' is obvious." *Pat-*

*terson v. United States*, D.C.App., 384 A.2d 663, 666 (1978).

**57.** The following discussion occurred just after the government finished its direct examination of Ms. Khaalis:

MR. WOLF [Clark's Counsel]: The witness has just testified and identified photographs

same day the prosecutor showed that photograph to Ms. Khaalis in his office—presumably before the hearing. Although we cannot be certain whether either of these two photographic showings were necessary, there was no clear stated reason for them. The fourth showing was at trial before eliciting Ms. Khaalis' identification testimony and this was necessary to provide a background for the court, the jury, and the parties—in order to evaluate her testimony properly and to open on direct examination areas specifically requested by defense counsel who desired to explore them on cross-examination.[58] The final "exhibition" of Clark was when he was seated in the courtroom—at which time Ms. Khaalis identified him.[59] Thus, one is able to conclude there was no apparent necessity for two of the five viewings of Clark by Ms. Khaalis—aside from her seeing him at the time of the offenses.

■ Considering both the presence of some suggestivity in the *entire* identification process (five viewings) and the apparent lack of necessity for two of the showings, we are unable to conclude that Clark's

due process rights were violated. We do not think that the prosecution employed an identification procedure, viewed in the totality of the circumstances, which was so unnecessarily suggestive as to lead to the substantial likelihood of irreparable misidentification of Clark.[60] *Compare Foster v. California, supra,* 394 U.S. at 443, 89 S.Ct. 1127 (holding all identification testimony of the witness inadmissible because the identifications were "virtually inevitable" under the circumstances). Consequently, her in-court identification testimony, although manifestly of little weight,[61] was admissible, and "[t]he reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." *Id.* at 442–43 n. 2, 89 S.Ct. at 1128. Counsel for Clark, in his thorough cross-examination of Ms. Khaalis at trial, exposed whatever weaknesses there were in her ability to identify him. See note 54, *supra.* Based on all the circumstances present here, we conclude that the admission of her identification testimony did not result in prejudicial error, and consequently could not be plain error.[62]

---

of people who were the leader, as the case may be. My question is, will such testimony be offered by the Government at the trial proper; if so, it would seem to me that I, on behalf of the defendant Clark, am entitled to inquire at this point.

THE COURT: Mr. Shuker.

MR. SHUKER: Well, Your Honor, I really don't know whether or not the Government will introduce evidence of that nature. If, for example, the defense starts implying through cross examination that identification was suggestive, then it may be necessary for the Government to explore the entire photographic procedure. It is a difficult question to answer at best, however,—

THE COURT: Do I gather that you wouldn't rely upon it in chief?

MR. SHUKER: I really, haven't made that decision, Your Honor.

THE COURT: Well, I think that Mr. Wolf's question is appropriate, because there may be a jury inference with a sting to Mr. Clark, if one of the photos resembled his client. The court then permitted Clark's counsel to cross-examine Ms. Khaalis. *See note 4 supra.*

58. See text *supra.*

59. During the suppression hearing, none of the defendants were present in the courtroom when Ms. Khaalis testified.

60. This is not to say that under somewhat different circumstances, the continued exhibition of a lineup photograph might not constitute an unnecessarily suggestive procedure and violate a defendant's due process rights, despite the absence of a pretrial identification.

61. As Judge McGowan explained in *Clemons v. United States,* 133 U.S.App.D.C. 27, 40, 408 F.2d 1230, 1243 (1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), "a courtroom identification . . . [is] an event which, standing alone, often means very little to a conscientious and intelligent juror, who routinely expects the witnesses to identify the defendant in court and who may not attach great weight to such an identification in the absence of corroboration."

62. Clark argues additionally that his motion for a new trial should not have been denied because of "the new evidence of . . . [Ms. Khaalis'] probable incredibility." Reply Brief for Appellant Clark at 20–21. The allegedly new evidence appeared during Ms. Khaalis' identification testimony at the subsequent trial of Harvey. *See United States v. Harvey,* D.C. Super.Ct. (Cr. No. 47903–73, Jan. 1, 1975), *appeal dismissed as moot, Harvey v. United States,* D.C.App., 385 A.2d 36 (1978). In that

## VI.

Appellants Clark and Christian contend that the evidence was insufficient to sustain their convictions.[63] We must therefore assess the sufficiency of the evidence with respect to each, accepting the government's evidence, and giving it the benefit of all reasonable inferences of fact [64]—cognizant that "no legal distinction is made between direct and circumstantial evidence." *In re E.G.C.*, D.C.App., 373 A.2d 903, 906 (1977); *United States v. Mackin*, 163 U.S.App.D.C. 427, 439, 502 F.2d 429, 441, *cert. denied*, 419 U.S. 1052, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974). It is settled law that this court "must make full allowance for the right of the trier of fact to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and a conviction will not be reversed as long as there is evidence which reasonably permits a finding of guilt." *In re E.G.C., supra* at 906. With those standards in mind, we turn to a review of the evidence against Clark and then against Christian.

*Clark*

Tracing the government's evidence of Clark's actions, we first find that Clark had used a stolen credit card issued in the name of Lorrene (or Lorraine) Goode to purchase gasoline for two automobiles, one of which belonged to Moody and the other to alleged co-conspirator Thomas Clinton.[65] This purchase occurred in Washington, D.C. on January 16, 1973. On January 17 this same credit card was again used by Clark to purchase gasoline for two cars, one of which was the alleged co-conspirator Clinton's Cadillac and the other one was unidentified.[66] On this latter date, gasoline was purchased in Philadelphia for both cars and in Aberdeen, Maryland, for just the Cadillac. Also, one of the gas station mechanics from the Aberdeen station testified that he repaired a gray 1969 Cadillac—the same year and color as Clinton's—on January 17 sometime after 3 p. m. He further testified that the Cadillac was driven by two black men, who appeared to be accompanied by at least two other black men riding in another, unidentified American car. After paying the bill, both cars headed south on Interstate 95—which leads directly to Washington, D.C.

On January 17, between 9 and 10 p. m., a man purporting to be William Horton of Philadelphia, Pennsylvania, registered for a party of six at the Downtown Motel at 501 New York Avenue, N.E., Washington, D.C.[67] Two handwriting experts each posi-

---

trial she confused Griffin with Price in connection with the particular role of one of the murderers. Although Griffin then moved successfully for a new trial on that basis—as newly discovered evidence—*United States v. Griffin*, D.C.Super.Ct. (Cr. No. 47902–73, Mar. 19, 1975), Clark never made such a motion subsequent to the discovery of that new evidence. Consequently, we have nothing to review. His argument would have been for presentation to the trial court pursuant to Super.Ct.Cr.R. 33.

Although Moody joins this argument, he did not file a notice of appeal from the denial of his motion.

**63.** Moody again incorporates these arguments to the extent applicable to him. His claim with respect to the sufficiency of the evidence is without merit.

**64.** *In re E.G.C.*, D.C.App., 373 A.2d 903, 906 (1977); *Crawford v. United States*, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967); *Curley v. United States*, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

**65.** The handwriting identification was "probable" that it was Clark's signature. As noted previously, "probable" means it is more likely than not the person in question wrote the signature. The other possible classifications for identification purposes are "positive," "highly probable," and "positive elimination." According to the handwriting expert, he was unable to identify Clark positively as the forger because both sets of handwriting exemplars given by Clark to the police appeared to have been deliberately disguised.

**66.** In the first transaction the license plates of both cars were written on the credit card receipts; however, in the later transactions only the Cadillac's license plate number was noted.

**67.** The motel's records showed that the "William Horton" party of six men occupied rooms 27 and 28. A motel employee identified Christian as being one of the occupants of Room 27 from having seen him there on January 18, at about 12:30 p. m. See text *infra*. A palmprint identified as belonging to co-conspirator Ron-

tively identified John Clark as the person who wrote the William Horton signature on the motel's registration form. Telephone records showed that on that same night at 10:38 p. m. there was a call from a coin-operated telephone outside the Downtown Motel to John Clark's telephone in Philadelphia.[68] The operator recorded the calling party's name as William Hawkins.[69] Telephone records showed that after the murders more telephone calls had been made between Washington and Philadelphia. On January 18 at 5:55 p. m. there was a call from Clark's telephone in Philadelphia to the desk at the Downtown Motel. Between 5 and 11 p. m. there was a call to Clark's telephone in Philadelphia from a pay telephone in the basement of Union Station in Washington, D.C. At 6:58 p. m. there was a call from Clark's telephone to this pay telephone in Union Station.[70]

A blue suitcase was found on January 18 in the back yard of a home at 7627 16th Street, N.W.—a location very close to the scene of the crimes. A witness testified to having seen a person—identified as Moody—running from the scene of the crime with a similar suitcase. Inside the suitcase were found numerous items among which was a brown paper bag, from which was taken a latent fingerprint impression.[71] An expert positively identified this print as having been made by the right middle finger of John Clark.[72]

Also found in the blue suitcase were several credit cards which had been stolen from a William Horton of Philadelphia—the same name used by Clark to register at the motel. Another stolen credit card as well as some personal papers of Horton's were found on January 18 and 19 in some bushes in front of 7542 14th Street, N.W. This location is also very close to the scene of the crimes and is in the direction some of the killers fled when they were chased by Hamaas Khaalis. Another credit card belonging to Horton and two pieces of paper with writing on them were later found around the same bushes. An identification card of William Horton's was used by Clark to rent a brown tuxedo from a store in a shopping

ald Harvey was found in Room 27. Harvey was positively identified by Ms. Khadyja Khaalis as the person she saw inside the door of her home when she returned from the store and discovered the murders.

68. That same evening two other telephone calls were also made from the same telephone. At 10:23 p. m. a call to James Price's telephone in Philadelphia was made by a person identifying himself as James Price. At some time between 5 and 11 p. m., an unidentified person called William Christian's telephone in Philadelphia.

69. The government contends that the telephone operator may have mistaken the name William Horton for William Hawkins.

70. Also, on January 18 between 8 a. m. and 5 p. m., there was a call to James Price's telephone in Philadelphia from a pay telephone at the Little Tavern near the intersection of New Hampshire and Georgia Avenues, N.W.

71. Also found inside the blue suitcase were two sawed-off shotguns, a box of unused shotgun shells, and a Philadelphia newspaper. The box of unused shells was identified as being identical—even the store price sticker was the same—to one purchased by David Khaalis, one of the victims, some time earlier. From the Philadelphia newspaper was taken a palmprint positively identified as having been made by the left palm of James Price.

72. Clark argues that "[t]he burden on the government, when it relies on fingerprint evidence, is to negate at least the most reasonable explanations of that evidence which are consistent with innocence, and to show that the fingerprints were made during the commission of the crime." *In re M. M. J.*, D.C.App., 341 A.2d 421, 422 (1975), *quoted in* Brief for Appellant Clark at 36. In that case, the *only* evidence linking appellant with the crime was the fingerprint evidence and the government's own evidence had raised the possibility of an innocent explanation. Furthermore, that case relied on *Townsley v. United States*, D.C.App., 236 A.2d 63 (1967). There, too, the government relied *solely* on "circumstantial fingerprint evidence . . . [and consequently] it must negate at least some of the reasonable inferences consistent with defendant's innocence that can be drawn from that evidence." *Id.* at 65. When, as here, the government is not relying *only* on fingerprint evidence to link the defendant to the commission of the offense and to support a finding of guilt, the same considerations or standards announced in those cases do not apply. *See generally In re M. M. J.*, *supra*; *Patten v. United States*, D.C.App., 248 A.2d 182 (1968); *Townsley v. United States*, *supra*.

center right outside Philadelphia on December 27, 1972—to be picked up on the 29th and worn on the 31st. The William Horton signature on the tuxedo receipt was positively identified as being Clark's.[73] Furthermore, John Clark was seen wearing a brown tuxedo on January 1, 1973.

One of the pieces of paper recovered with the Horton materials appeared to be a receipt with the writing, "Received of Brother Lieutenant John 38X." [74] This was the name John Clark was known by in Philadelphia's Mosque Number Twelve. The other paper found there was a shopping list which was identified as having been written by Abdul Nur, and which one could reasonably infer was taken from his dead body in the Khaalis house.[75]

The final incriminating evidence was Amina Khaalis' in-court identification of John Clark as being one of the offenders she saw in the house—in her words, the leader.

*Christian*

Although the government's evidence against Christian was by no means overwhelming, it was nonetheless sufficient to sustain the jury's verdict. First, Ms. Sarah Robinson, an employee at the Downtown Motel identified Christian as the man in room 27 to whom she had given towels at around noon on January 18, 1973.[76] Ms. Robinson identified Christian on three different occasions. The first time was on March 16, 1973, when she went to Metropolitan Police Headquarters and was shown an array of twelve photographs. From this array she indicated that six of the men pictured resembled the man to whom she had given the towels because they had similar facial features.[77] From the six, Ms. Robinson selected one photograph, depicting appellant Christian, which most "looked like the fellow [she] had seen at the door."

On May 3, 1973, Ms. Robinson attended two lineups where she again pointed to several people who she said resembled Christian because they had similar facial features. On this occasion, Ms. Robinson did not, however, positively identify anyone. Indeed, Christian was not present in this lineup.[78] On February 12, 1974, during the pretrial identification suppression hearing, Ms. Robinson again had the opportunity to view some photographs. After taking the witness stand, she was shown a book of pictures that she had never seen before, and positively identified appellant Christian's photograph.[79] Her third and final identification of Christian came in court at trial.

Christian's presence at the Downtown Motel was further corroborated by the introduction of telephone records showing that a call was made from a pay telephone at the motel to Christian's Philadelphia telephone on the evening of January 17, 1973, between the hours of 5 p. m. and 11 p. m. The records showed that this call was made from the same telephone that was used by James Price to call his home in Philadelphia and by "William Hawkins" to call John

---

73. The forged signature of a John Wright on another tuxedo rental receipt written at the same time on the same day was positively identified as co-conspirator Thomas Clinton's handwriting.

74. This name was the type given to a person who joined the Nation of Islam.

75. Abdul Nur had taken Ms. Khadyja Khaalis to the store shopping, and when she realized she had forgotten her money, he returned to the house for her—only to be killed by the intruders.

76. Ms. Robinson testified that she had the opportunity to view Christian in the doorway from a distance of three feet for a period of sixty seconds.

77. More specifically, Ms. Robinson testified that the man she gave the towels to had a big nose, and she thought it might be helpful if she were to give this type of descriptive information to the police.

78. The government had served appellant Christian with a subpoena to appear in a lineup on this date. Instead of complying, however, Christian fled to Florida and concealed his identity. We discuss Christian's flight, concealment, and the legal inferences to be drawn therefrom, *infra*.

79. The record shows that none of the appellants were present at this hearing.

Clark's home in Philadelphia on the same date during the same period of time.[80] There was additional evidence showing Christian's close association with the other conspirators. The government showed that the stolen Exxon credit card belonging to Lorrene Goode, the same card used by appellant Clark on the day of the murders, was used on five subsequent occasions by appellant Christian.[81] Furthermore, evidence was introduced showing that Christian used Thomas Clinton's Cadillac and a second car which was rented by Clinton. Christian also was a member of Philadelphia's Mosque Number Twelve, the Black Muslim Mosque attended by some of the codefendants.

The case against Christian was not based solely upon evidence of association. Significantly, he fled from Philadelphia to Jacksonville, Florida, soon after receiving a subpoena to appear in a lineup in the District of Columbia. Once in Florida, Christian made efforts to completely conceal his identity.

On April 26, 1973, Detective Jandorf of the Metropolitan Police Department went to Philadelphia for the purpose of serving William Christian with a subpoena which required that he appear in the May 3 lineup. Detective Jandorf testified that when he explained to Christian the purpose of the subpoena, Christian appeared to be quite nervous, and asked, "What if I'm picked?" On May 7, 1973, Christian and another code-

fendant, John Griffin, who had also been subpoenaed to appear in the May 3 lineup, fled and arrived in Jacksonville, Florida, where they lived together until July 29, 1973. On that date, Christian registered at the Ambassador Hotel, in Jacksonville, under the name of William Cotton. He resided there until August 17, 1973, when he signed a lease for residence at the Lake Park Apartments in Jacksonville.[82] Christian's wife and children lived with him there until October 2, 1973, when he was arrested by special agents of the Federal Bureau of Investigation.[83]

 It is generally accepted that the flight of an accused is a fact which tends to prove his consciousness of guilt and thus guilt itself. *See, e. g., Allen v. United States*, 164 U.S. 492, 499, 17 S.Ct. 154, 41 L.Ed. 528 (1896); *Williams v. United States*, D.C.App., 240 A.2d 131, 132 (1968); *Green v. United States*, 104 U.S.App.D.C. 23, 25, 259 F.2d 180, 182 (1958), *cert. denied*, 359 U.S. 917, 79 S.Ct. 594, 3 L.Ed.2d 578 (1959). *See also* 2 Wigmore on Evidence § 276 (3d ed. 1940). Although evidence of flight does not give rise to a legal presumption of guilt, *Hunt v. United States*, 115 U.S.App.D.C. 1, 3, 316 F.2d 652, 654 (1963), "flight is a circumstance from which a court . . . may infer what everyone in daily life inevitably would infer." *United States v. Heitner*, 149 F.2d 105, 107 (2d Cir. 1945) (Hand, J.).[84]

---

**80.** Hence, it is readily inferable that appellant Christian was one of the six persons who checked into rooms 27 and 28 at the Downtown Motel on January 17. In addition, Christian's presence in room 27 at noon on the day of the murders is established by Sarah Robinson's testimony.

**81.** A handwriting expert compared exemplars supplied by Christian and compared them to the signatures which appeared on the credit card sales ticket. His conclusion was that it was "probable" that Christian had forged the signature of Lorrene Goode on two of the tickets and a "Jason" or "Jaseen" Goode on three of them. *See* note 65 *supra*, for an explanation of the term "probable" in the context of a handwriting identification.

**82.** The evidence also showed that Christian had a social security card, Florida driver's license

and checking account all in the name of William Cotton, and that he worked at the Jacksonville shipyard under the name of Thomas Jones.

**83.** The lease agreement listed his wife's name as Linda Cotton, and his children as Toya Cotton and Kia Cotton.

**84.** In a related assignment of error, Christian challenges the admissibility of the evidence of flight and concealment by contending that the government did not first establish that Christian knew he was being sought in connection with this particular crime when he fled. Appellant first raised this issue at the bench when the government proffered the evidence of flight and concealment. We do not consider that such an evidentiary predicate is necessary as a matter of law.

■ In addition to flight, the government introduced evidence of Christian's concealment. The inferences which a jury may properly draw from such concealment are almost identical to those of flight. Thus Christian's concealment further corroborates his consciousness of guilt and therefore guilt itself. *See, e. g., Marcoux v. United States*, 405 F.2d 719, 721 (9th Cir. 1968); *Snell v. State*, 302 So.2d 487, 488 (Fla.1974); *Rogers v. State*, 262 Ind. 315, 315 N.E.2d 707, 712 (1974); *People v. Maldonado*, 3 Ill.App.2d 216, 278 N.E.2d 225, 230 (1971); *State v. Callihan*, 11 Ohio App.2d 23, 227 N.E.2d 654, 658 (1967).

## Conclusion

■ Viewing this evidence in the light most favorable to the government and allowing for all reasonable inferences therefrom, we can reverse for lack of sufficient evidence only if we are convinced that "no reasonable mind could fairly have found . . . [appellant] guilty without a reasonable doubt . . . ." *United States v. Bolden*, 169 U.S.App.D.C. 60, 64–65, 514 F.2d 1301, 1305–06 (1975), *quoted with approval in Calhoun v. United States*, D.C. App., 369 A.2d 605, 607 (1977). Though the evidence is not compelling and primarily circumstantial, we conclude it passes muster under the controlling standards.[85] The evidence presented against both appellants—although primarily circumstantial—was sufficient to "reasonably permit . . . a finding of guilt [beyond a reasonable doubt]." *In re E. G. C., supra* at 906.[86]

We note the United States Court of Appeals for the Ninth Circuit has held that the government's failure to lay such a foundation does not preclude the admission of evidence of a defendant's flight. *Shorter v. United States*, 412 F.2d 428 (9th Cir.), *cert. denied*, 396 U.S. 970, 90 S.Ct. 454, 24 L.Ed.2d 436 (1969). Moreover, Professor Wigmore has addressed this issue and stated:

It is occasionally required by a Court that the accused should have been *aware* that he was charged or suspected. This is unnecessary; it is the act of departure that is itself evidential; ignorance of the charge is merely a circumstance that tends to explain away the guilty significance of the conduct. [2 Wigmore on Evidence, *supra* § 276(a) at 116.]

Finally, we add that a defendant's flight to avoid participating in a lineup is admissible evidence and that a logical inference to be drawn from flight is the defendant's fear that he would be identified as the criminal. *United States v. Parhms*, 424 F.2d 152 (9th Cir.), *cert. denied*, 400 U.S. 846, 91 S.Ct. 92, 27 L.Ed.2d 83 (1970); *cf. United States v. Franks*, 511 F.2d 25, 36–37 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975) (defendant's refusal to give court-ordered exemplar properly admitted; trial court's instruction as to inferences of guilty consciousness from said refusal proper; *United States v. Nix*, 465 F.2d 90, 94 (5th Cir.), *cert. denied*, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972) (court's instruction and prosecutor's comment regarding inferences of guilt to be drawn from defendant's refusal to submit handwriting specimen was proper).

85. The trial court, in considering motions for a new trial filed by Clark, Christian, Moody, and Griffin, described its role "[a]s the thirteenth juror, [and said] this Court has no doubt or uncertainty respecting the integrity and propri-

ety of the verdicts involving the defendants Clark, Moody, and Christian. The evidence against Messrs. Clark and Moody was overwhelming, and the evidence against Christian, if not overwhelming, was decisively convincing." The court then also considered the possible prejudicial effects of joinder on the four defendants and remarked:

In Griffin's case . . . the scales may have been tilted by the reflected weight of the mass of evidence against his codefendants, Messrs. Clark, Moody, and Christian. There was no risk in the case of those three defendants, that is, there was no such risk in the case of those three defendants. While the weight of incriminating evidence was not equal as between them, in no case was there the possibility that the evidence against one would prejudicially rub off against the other. This is so because each of those three defendants was identified beyond peradventure, by convincing evidence, direct and circumstantial, pointing to him alone.

86. Christian also complains that during rebuttal argument, the prosecutor improperly commented on his failure to take the stand in his own defense. He contends the comments were so prejudicial as to warrant a mistrial. We see no merit in this contention. The prosecutor's remarks were in response to defense counsel's closing argument and were directed to Christian's failure (1) to support his prior attack on the credibility of a government witness and (2) to offer certain other contradictory evidence. It is permissible to argue that the government's proof is uncontradicted if the defendant's failure to testify is not directly implicated. *Wright v. United States*, D.C.App., 387 A.2d 582 (1978). The prosecutor's remarks were within the bounds of reasonable advocacy and were

## VII.

Appellants Clark and Moody claim their convictions were obtained in violation of the Interstate Agreement on Detainers (Agreement), D.C.Code 1973, § 24–701; 18 U.S.C.App. p. 271 (1978 Supp.). Specifically, they invoke Article IV(e) of the Agreement which provides:

If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V(e) hereof, *such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.* [Emphasis added.]

The Agreement was adopted in 1970 by Congress on behalf of the United States and the District of Columbia, bringing the number of party "states" to 48. *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 1838, 56 L.Ed.2d 329 (1978). It was first proposed by the Council of State Governments in 1956 as a response to the growing problems of the detainer system whereby authorities notified prison officials that charges were pending against a prisoner in another jurisdiction. The detainer itself is not a demand for immediate surrender of the prisoner, but only a request from the official lodging the detainer that he be notified before the inmate is released from custody. *Ridgeway v. United States*, 558 F.2d 357, 360 (6th Cir. 1977). In many instances, the detainer would lay dormant for years, until the prisoner had completed his sentence. The jurisdiction lodging the detainer could then bring the prisoner to trial on its outstanding information or indictment. The abuses of the system were many. The prisoner often did not respond to training programs geared toward his reintegration into society, knowing there was little opportunity for release after service of sentence. He frequently was not eligible for favorable work assignments or recreational programs and would be kept in close custody. Many jurisdictions denied parole to prisoners who had detainers lodged against them. In short, the old detainer system inhibited an effective program of rehabilitation. Furthermore, because the prisoner was incarcerated, he could not seek out witnesses or evidence to preserve his defense for a possible later trial in another jurisdiction. And, as the detainer could sit for years, he was often denied his right to a speedy trial. *See* Council of State Governments, *Suggested State Legislation Program for 1957* at 74 (1956); S.Rep. No. 91–1356, 91st Cong., 2d Sess., *reprinted in* U.S.Code Cong. & Admin.News, p. 4864 (1970). The Agreement seeks to correct these limitations. Article I states:

. . . [I]t is the policy of the party States and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, information, or complaints.[87]

---

not " 'manifestly intended [nor were] of such character that the jury would naturally and necessarily take [them] to be a comment on the failure of the accused to testify.' " *Doty v. United States*, 416 F.2d 887, 890 (10th Cir. 1969), *quoted in Peoples v. United States*, D.C. App., 329 A.2d 446, 450 (1974). *Accord, Blango v. United States*, D.C.App., 335 A.2d 230, 232 (1975); *United States ex rel. Leak v. Follette*, 418 F.2d 1266, 1269 (2d Cir. 1969), *cert. denied*, 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970).

**87.** In *United States v. Mauro, supra*, the Supreme Court listed the guiding principles of the Agreement:

"1. Every effort should be made to accomplish the disposition of detainers as promptly as possible.

2. There should be assurance that any prisoner released to stand trial in another jurisdiction will be returned to the institution from which he was released.

3. Prison and parole authorities should take prompt action to settle detainers which have been filed by them.

4. No prisoner should be penalized because of a detainer pending against him unless a thorough investigation of the detainer has been made and it has been found valid.

5. All jurisdictions should observe the principles of interstate comity in the settlement of detainers, and each should bear its

Article III permits the sentenced prisoner to clear detainers by initiating proceedings designed to dispose of charges pending in other jurisdictions. Article IV, with which we are concerned, provides a method whereby prosecuting authorities may secure a prisoner serving a term of imprisonment in another jurisdiction for trial on an outstanding indictment. Once the prisoner is transferred to the "receiving" state (the jurisdiction where charges are pending), trial must be had on the outstanding indictment before the prisoner is returned to the "sending" state (his original place of imprisonment). Article IV(e), *supra*, subjects the indictment to dismissal "with prejudice" if the Agreement is violated.

 Appellants were incarcerated in Philadelphia jails awaiting trial on unrelated federal and state charges when the indictments in this case were returned. They were transferred back and forth between Philadelphia and Washington, D. C., on several occasions after they were arraigned but before they were tried on the instant charges. Consequently, they argue, the indictments on which their convictions are based must be dismissed. Appellants raise this argument for the first time on appeal.[88] We conclude (1) appellants have waived any right to dismissal of the indictments under the Agreement by not raising this issue by motion in the trial court, and (2) the rationale of the Agreement would not be furthered by dismissal of the indictments.

 A. Despite the Agreement's seeming mandatory language ordering dismissal of the charges if its provisions are violated ("the indictment . . . shall not be of any further force or effect, and the court shall [dismiss] the same with prejudice"), the courts which have confronted claims under the Agreement have assumed the rights conferred can be waived by the prisoner. *See United States v. Ford*, 550 F.2d 732, 742 (2d Cir. 1977), *aff'd*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); *United States v. Scallion*, 548 F.2d 1168, 1174 (5th Cir. 1977); *Gray v. Benson*, 443 F.Supp. 1284, 1293 (D.Kan.1978); *Strawderman v. United States*, 436 F.Supp. 503 (E.D.Va. 1977); *Neville v. Friedman*, 67 Ill.2d 488, 367 N.E.2d 1341 (1977), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1132 (1978); *People v. Primmer*, 59 A.D.2d 221, 399 N.Y.S.2d 478 (1977); *People v. Squitieri*, 91 Misc.2d 290, 397 N.Y.S.2d 888 (1977); *People v. White*, 33 A.D.2d 217, 305 N.Y. S.2d 875 (1969); *State v. West*, 79 N.J.Super. 379, 191 A.2d 758 (1963). The decisions are less than helpful, however, in determining whether there must be a waiver-in-fact, *i. e.*, a "knowing" waiver, or whether the rights afforded under the Agreement are of a class which are inferentially waived if not raised prior to or during trial (Super.Ct. Cr.R. 12).[89] *See Gray v. Benson, supra.*

In *United States v. Mauro*, 544 F.2d 588 (2d Cir. 1976), *rev'd on other grounds*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the Second Circuit stated in a footnote that for a waiver of rights under the Agreement to be effective, "it must have been an 'intentional relinquishment or

own proper burden of the expenses and effort involved in disposing of the charges and settling detainers." [*Id.* 436 U.S. at 350, 98 S.Ct. at 1842 (citation omitted).]

**88.** The contention was first made in supplemental briefs. Moody contends the issue was effectively raised in an August 30, 1973, pro se letter to the trial court in which he complained of the illegality of his "extradition" to the District. We fail to perceive how this complaint put either the court or the government on notice that Moody was invoking his right to dismissal of the charges if the government transferred him *back* to Philadelphia.

**89.** Super.Ct.Cr.R. 12 provides in pertinent part:
(b) Any defense, objection, or request *which is capable of determination without the trial of* the general issue may be raised before trial by motion . . . .. The following must be raised prior to trial:
(1) Defenses and objections based on defects in the institution of the prosecution; or
(2) Defenses and objections based on defects in the indictment or information (other than it fails to show jurisdiction in the court or to charge an offense . . .);

\* \* \* \* \* \*

(d) Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, . . . shall constitute waiver thereof, but the court for [good] cause shown may grant relief from the waiver. [Emphasis added.]

abandonment of a known right or privilege.' *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)." *Id.* at 591 n.3. In *Mauro,* appellee Fusco had requested his return to state prison after arraignment. Nevertheless, the court held there was no "knowing" waiver. Shortly after. *Mauro* was decided, the Second Circuit handed down its opinion in *United States v. Ford, supra,* where on similar facts (appellant requested the transfer), the court held he had waived his right to dismissal of the charges under Article IV(e).

> The provision [Article IV] . . . is intended to avoid the disruptions in a prisoner's rehabilitation occasioned by repeated transfers between jurisdictions, is thus for his benefit and is waivable. Here, appellant himself requested the transfer and by doing so waived his objection to it under Article IV(e). [550 F.2d at 742.]

The *Ford* court did not mention the *Johnson v. Zerbst* constitutional waiver standard. In fact, the opinion leaves one with the impression that Ford was not aware of his rights under the Agreement. Since Ford had specifically requested the transfer, however, the court expressly did not decide "whether the failure of a prisoner to express a preference as to the place of his incarceration pending trial, either through ignorance of his statutory right or otherwise, would nevertheless constitute a waiver of that right." *Id.* n. 29.[90]

Two other recent opinions of the Second Circuit, *United States v. Cyphers,* 556 F.2d 630 (2d Cir. 1977), *cert. denied,* 431 U.S. 972,

97 S.Ct. 2937, 53 L.Ed.2d 1070 (1978), and *United States v. Edwards,* 564 F.2d 652 (2d Cir. 1977), have failed to clarify the Second Circuit's position on waiver of claims under the Agreement. In *Cyphers,* the court held that where there was no showing the defendant knew, prior to trial of the detainer lodged against him, he could invoke Article IV(e) for the first time on appeal.[91] In *Edwards,* however, the court held that an Article IV violation was not subject, under any circumstances, to collateral attack under 28 U.S.C. § 2255 because the defect, if any, involved neither constitutional error, lack of jurisdiction, nor "a fundamental defect which inherently results in a complete miscarriage of justice . . ." *Id.* at 654 (citation omitted).[92]

In *United States v. Scallion, supra,* the defendant failed to present his Article IV claims to either the district court or the appellate court prior to his petition for rehearing in the latter. The government contended he had waived any violations. The Fifth Circuit agreed, stating:

> To consider Scallion's unconstitutional claim at this late stage would tend to encourage piecemeal litigation of claims of error in the appellate courts and undercut the policy of achieving prompt and final judgments. Even when the constitutional issue of a right to a speedy trial is involved, failure to raise it before or during trial has been held to waive the issue. [*Id.* at 1174.]

Similarly, the state courts of New York and Illinois have not required a waiver-in-fact

---

**90.** Ford had consistently demanded a speedy trial, however, ʳand the court held hɛ had not waived the speedy trial provisions of Article IV. The Supreme Court, too, felt that Ford's actions were "sufficient to put the Government and the District Court *on notice* of the substance of his [speedy trial] claim." 436 U.S. at 365, 98 S.Ct. at 1849 (emphasis added).

**91.** The reasoning of the court in *Cyphers* is curious: until *United States v. Mauro, supra,* was reversed by the Supreme Court in May 1978, it had been the law in the Second Circuit that a writ of habeas corpus *ad prosequendum* (by which the appellant in *Cyphers* was transferred) constituted a detainer for purposes of the Agreement. Thus, knowledge that a formal

detainer had been filed was irrelevant to a claim under the Agreement; cognizance of a transfer by writ of habeas corpus was sufficient.

**92.** *But see United States ex rel. Esola v. Groomes,* 520 F.2d 830 (3d Cir. 1975) (claim that Agreement violated states a cause of action under 28 U.S.C. § 2254); *Enright v. United States,* 434 F.Supp. 1056 (S.D.N.Y.1977) (Article IV violation constitutes a jurisdictional defect in indictment; claim cognizable under 28 U.S.C. § 2255). We assume that since *Enright* was decided before *Edwards,* it has been implicitly overruled by *Edwards* to the extent it is inconsistent.

and have rejected the notion that the *Johnson v. Zerbst* "knowing and intelligent" waiver standard controls. *See Neville v. Friedman, supra* (request for continuance plus failure to object to transfer back to sending jurisdiction constituted waiver of claim); *People v. Primmer, supra* (failure to raise issue until appeal amounted to a "telling example of a waiver of his rights under the statute"); *People v. White, supra* (appellant waived Article IV speedy trial rights by not raising them before appeal).

Only one decision in this jurisdiction has addressed the question of waiver. In *United States v. Randall*, 429 F.Supp. 18, 20 (D.D.C.1977), 185 U.S.App.D.C. 133, 566 F.2d 798 (1977) (unpublished), the district court adopted the Second Circuit's position in *Mauro* and held there must be a knowing waiver of one's rights under the Agreement. The defendant in *Randall* had specifically requested to be returned to the state of Maryland, but the court held he had not "intentionally relinquished" his rights under the Agreement. The circuit court reversed, holding that Randall was "estopped" from claiming his rights were violated under the Agreement because he was sent back to Maryland at his own request.

Several principles are suggested by these decisions. First, rights under the Agreement can be waived. Second, other than the Second Circuit's opinion in *Mauro*, which disposed of the issue in a footnote, and a district court's opinion in *Enright v. United States*, 434 F.Supp. 1056 (S.D.N.Y. 1977), which in some respects is inconsistent with a later decision of the Second Circuit (see note 92 *supra*), the courts have not required that the traditional standard for the waiver of constitutional rights be applied to a waiver of a defendant's statutory rights under the Agreement. We find this view eminently sound. *Johnson v. Zerbst, supra*, involved the Sixth Amendment right to counsel. "Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Schneckloth v. Bustamonte*, 412 U.S. 218, 237, 93 S.Ct. 2041, 2052, 36 L.Ed.2d 854 (1973). Although "an approach . . presuming waiver of a fundamental right from inaction, is inconsistent with this Court's pronouncements on waiver of constitutional rights," *Barker v. Wingo*, 407 U.S. 514, 525, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1972), the right of a prisoner not to be transferred back to his original place of imprisonment before he is tried is neither fundamental nor constitutional. A vast difference exists between those rights inherent in a fair trial and constitutionally guaranteed to every defendant and the protections afforded a prisoner under this statute. Article IV(e) was enacted to prevent disruptions in a prisoner's rehabilitation, *United States v. Ford, supra*. The rights conferred under the Agreement are a matter of legislative grace; they can be rescinded as readily as they were granted. Article VIII provides that a state may withdraw from the Agreement at any time by enacting a repealing statute.

We conclude that absent "good cause shown," a failure to present a claim under the Agreement at the trial level constitutes a waiver of those rights under Super.Ct.Cr.R. 12(d). A violation of the Agreement is not recognizable as a claim of lack of subject-matter jurisdiction or failure to state an offense (which may be raised at any time). Rule 12(b)(2). *United States v. Edwards, supra; Strawderman v. United States, supra; Brown v. District Court*, 571 P.2d 1091 (Colo.1977) (en banc); *People v. Squitieri, supra*. It is established that irregularity in the proceedings by which a person is brought to trial does not deprive the court of jurisdiction. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Hardy v. United States*, 250 F.2d 580 (8th Cir.), *cert. denied*, 357 U.S. 921, 78 S.Ct. 1362, 2 L.Ed.2d 1365 (1958). A violation of the Agreement is a defense "which is capable of determination without the trial of the general issue." Rule 12(b). It thus comes within that class of rights which must be asserted before trial or, at least, during the trial itself. *See generally* 8

Moore's Federal Practice § 12.03 (2d ed. 1977); 1 Wright, Federal Practice and Procedure § 93 (1969). We note that other statutory claims, which may also serve as a bar to prosecution come within this class. For example, it is generally accepted that statute of limitations claims should be raised no later than the trial. If the statute of limitations is applicable to the indictment itself then "the defense of the statute must be raised at the trial or before trial on motion. If this is not done and a verdict of guilty is rendered, sentence may be lawfully imposed." *Askins v. United States*, 102 U.S.App.D.C. 198, 202, 251 F.2d 909, 915 (1958) (footnotes omitted).[93] *Accord, United States v. Kenner*, 354 F.2d 780, 785 (2d Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966); *United States v. Franklin*, 188 F.2d 182, 186 (7th Cir. 1951); Moore's Federal Practice, *supra* at 12–18.

■■■■■ Challenges to the validity of an indictment (other than it fails to state an offense), *Sewell v. United States*, 406 F.2d 1289 (8th Cir. 1969), or to the selection or composition of grand or petit juries, *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), must be raised before trial or waived. Even a constitutional defense, the guarantee against double jeopardy—whose practical result, if upheld, is to prevent a trial from ever taking place— must be raised before trial. "The constitutional immunity from double jeopardy is a personal right which, if not affirmatively pleaded by the defendant at the time of trial, will be regarded as waived." *United States v. Scott*, 150 U.S.App.D.C. 323, 324, 464 F.2d 832, 833 (1972), and cases cited

therein. *Accord, United States v. Perez*, 565 F.2d 1227, 1232 (2d Cir. 1977). If the defendant can waive, through his silence, a constitutional right, we see no reason why he cannot likewise waive a statutory right such as that granted to him by the Agreement.

■■■■■ Appellate courts have recognized that exceptions exist to the general practice of declining to notice alleged errors raised for the first time on appeal, where it is likely there has been a "miscarriage of justice," *Adams v. United States*, D.C.App., 302 A.2d 232, 234 (1973), or where the error "seriously affect(s) the fairness, integrity or public reputation of judicial proceedings," *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). We find the exceptions inapplicable here. Appellants were given a fair trial and a full opportunity to contest the charges against them. The error asserted here does not in any way affect the truth-seeking process. Nor does it impinge on any fundamental or constitutionally guaranteed right. If we were to consider these dilatory claims, the Agreement could be used, not for the purpose of protecting any legitimate interest a prisoner may have in his rehabilitation, but rather, to secure relief from an otherwise lawful conviction. To permit a defendant who remained silent while he was returned temporarily to his place of imprisonment to gain, on that basis, dismissal of the indictment at the appellate stage, would make a mockery of the jury's verdict and serve to undermine the interests of justice.[94] The Agreement is a long-overdue piece of legislation designed to correct untenable abuses by government officials in the use of de-

---

93. *Askins* recognizes an exception where the statute applies not to the indictment, but to the validity of the sentence. In that situation, the question of lawfulness of the sentence does not arise until after the trial.

94. We limit our holding to the "no-rendition" provision of Article IV(e). We recognize that the same considerations may not apply to the speedy trial guarantees of the Agreement. A prisoner may not only have his rehabilitation programs interrupted, but also suffer prejudice to his defense if he is not tried within a reasonable time. By this, we do not imply that speedy trial claims under the Agreement need not be raised at the trial level. We note that under the federal Speedy Trial Act, failure to move for dismissal prior to trial constitutes a waiver of rights under that statute. 18 U.S.C. § 3162(a)(2). Although the Agreement does not contain a similar provision, it would not work an undue hardship on defendants for appellate courts to refuse to consider such claims if not raised at trial. The accused may still pursue his Sixth Amendment claim. *See Barker v. Wingo, supra.*

tainers. This is not to say, however, that it should be interpreted so as to create a sanctuary on appeal for convicted defendants. It must be construed soundly. A claim the Agreement has been violated should be raised at the earliest possible time before the witnesses and the parties have gone to the burden and expense of a trial. Here, a three-month trial was concluded with a jury verdict of guilty. Appellants were lawfully sentenced. It is reasonable to require defendants to claim the benefits of this statutory right which may bar prosecution before judicial resources are employed.

We hold that under Rule 12(d) appellants have waived any objections to alleged violations of the Agreement. We also find that "good cause" has not been shown that would alleviate the effect of a waiver. Appellate counsel complain *they* were unaware appellants were transferred back to Philadelphia after arraignment in Washington, D.C. But, obviously, appellants and their trial counsel knew of the transfers. Contrary to appellants' claims on appeal, trial counsel were also aware of the circumstances of appellants' transfers *to* the District— motions were filed in the trial court challenging the court's authority to issue writs of habeas corpus *ad testificandum* or *ad prosequendum*. Finally, appellants assert they did not know detainers had been lodged against them and that they were not informed of their rights under the Agreement. Even if we were to accept these assertions as factual, we think it would have required little effort to inquire of prison officials whether detainers were on file. Moreover, as we stated previously, there need not be an "intentional relinquishment" of a "known" right for there to be a waiver under the Agreement. Appellants and

their trial counsel clearly had knowledge of sufficient facts to put them on notice of a claim under the Agreement. *Cf. Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963).[95]

B. Independent of waiver considerations, the circumstances of this case do not comport with the underlying purposes of the Interstate Detainer Agreement. At the time of their transfers to the District of Columbia, appellants were confined in local Philadelphia facilities pending disposition of outstanding charges. The government apparently filed detainers against both appellants. Both also had been previously convicted of other charges. We conclude, however, that because it appears neither Clark nor Moody had entered upon a "term of imprisonment" as contemplated by the Agreement, its provisions do not apply.[96]

On January 4, 1973, Moody was arrested in Philadelphia on charges of receiving stolen goods and released on $300 bail. He was again arrested in Philadelphia on February 7, 1973, and charged *inter alia* with aggravated robbery, conspiracy and threats to kill. Bail was revoked and he was committed to Philadelphia County Prison to await trial on both offenses. On September 25, 1973, he was convicted after a nonjury trial of receiving stolen goods and sentenced to a six-to-twenty-three months' term of imprisonment. On October 2, 1973, Moody noted an appeal from his conviction. Under Pennsylvania law, he was entitled to a jury trial *de novo.* 17 Pa.Stat.Ann. § 711.18 (Purdon Supp.1977). His sentence was arrested by law (Pa.R. Cr.P. 6011) and prison records indicate Moody was "discharged" from his sentence but "recommitted" to custody pending the trial *de novo*[97] and disposition of his other

---

95. Moreover, because indications are that neither appellant was actually serving a sentence of imprisonment, we question whether it was the duty of any official to notify them of their "rights" under the Agreement. There is nothing in the record either confirming or controverting appellants' assertions that they were not notified of detainers lodged against them.

96. As appellants say "[t]he prison records pertaining to appellants Clark and Moody are far

from precise, and in some cases nearly illegible." Joint Supplemental Reply Brief for Appellants at 4. This highlights the necessity of raising issues of this nature in the trial court. We will consider the question only to the point where the facts are undisputed between the parties.

97. A *nolle prosequi* was entered on this charge in February 1975.

charges. From October 3, 1973, until the end of trial in this case, his status remained that of a pretrial detainee.[98] Moody was not transferred to the District of Columbia during the period he could be considered to have been serving a sentence—September 26 to October 3, 1973.

Turning to appellant Clark, on November 17, 1972, he was released from the Lewisburg Federal Penitentiary on bond pending appeal of a fifteen years' sentence for federal bank robbery. He was arrested in Philadelphia on other bank robbery charges on March 16, 1973, and held in the Philadelphia Detention Center to await his trial. On March 20, 1973, the Third Circuit affirmed Clark's 1972 conviction. On that date, a federal detainer was lodged against Clark in the Philadelphia Detention Center pursuant to the affirmance of his conviction. On August 16, 1973, Washington, D.C., authorities lodged a detainer against Clark; thereafter he was transferred back and forth between Philadelphia and Washington, D.C., several times.

The Agreement was enacted to cure the disadvantages of the detainer system inuring to sentenced prisoners who had entered the life of the institution to which they had been committed. There is nothing in the legislative history or in the Agreement itself to indicate that its provisions were intended to apply to persons who were not involved in rehabilitative programs. Article IV(e) was designed to avoid the shuttling back and forth between jurisdictions and the resulting disruptive effect such transfers would have on a consistent treatment program and to promote the speedy disposition of outstanding charges upon which the detainers were based. For these reasons, courts which have addressed the issue have recognized that a prisoner who is being temporarily incarcerated pending disposition of charges is not entitled to invoke the protections of the Agreement. *United States v. Harris*, 566 F.2d 610 (8th Cir. 1977); *United States v. Roberts*, 548 F.2d 665 (6th Cir.), *cert. denied*, 431 U.S. 920, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977); *United States v. Evans*, 423 F.Supp. 528 (S.D.N.Y.1976), *aff'd*, 556 F.2d 561 (2d Cir. 1977); *Cresong v. Nevil*, 51 A.D.2d 1096, 381 N.Y.S.2d 355 (1976); *Seymour v. State*, 21 Ariz.App. 12, 515 P.2d 39 (1973); *Davidson v. State*, 18 Md.App. 61, 305 A.2d 474 (1973). In *Roberts*, the court stated:

> We conclude that the Agreement is only concerned that a sentenced prisoner who has entered into the life of the institution to which he has been committed for a term of imprisonment not have programs of treatment and rehabilitation obstructed by numerous absences in connection with successive proceedings related to pending charges in another jurisdiction. There is no indication in the language of the Agreement or in the legislative history that its provisions were intended to apply to persons being detained for trial who are not serving prison sentences. [*United States v. Roberts, supra* at 670–71.]

This reasoning is sound. If a prisoner is in custody to await trial, and is not involved in special institutional treatment or rehabilitative programs geared toward his eventual release into society, the potential for abuse of the detainer system is not present.

Appellants have offered no evidence to show they were engaged in or even eligible for rehabilitative programs at the time they were confined in local Philadelphia jails.[99]

---

**98.** Moody contends the fact that he filed a notice of appeal did not convert him back into the status of a pretrial detainee. He notes that the time he spent incarcerated pending his trial *de novo* would have been credited against the sentence received. Pa.R.Cr.P. 1406. This argument is spurious for two reasons. First, the fact that Moody may have received credit for the time he was incarcerated does not convert that period of incarceration into a "sentence" within the meaning of the Act. Credit may also be received for periods of pretrial confinement. *See* Pa.Cr.R. 1406(b). Second, entitlement to credit is an academic question in Moody's case. He was never tried *de novo*, never convicted, and thus, never sentenced on the receiving stolen property charge (see note 97, *supra*). Any time he may have been incarcerated on that charge was "dead time" and there is no sentence which can be credited.

**99.** Moody asserts that the arrest of his sentence by the notice of appeal "had no effect on

As noted previously, we consider that Moody was not under service of sentence at the time of his transfers to the District of Columbia and not eligible for such programs. As Clark's 1972 conviction was affirmed while he was awaiting trial on other charges, his status is somewhat unclear.[100] But as a federal prisoner, it is apparent he was in the Philadelphia Detention Center only to await trial there on his outstanding bank robbery charges. He would eventually be returned to a federal penitentiary for service of his sentence. He thus had not yet "entered into the life of the institution to which he had been committed for a term of imprisonment." *United States v. Roberts, supra* at 670.

The special circumstances of this case bolster our view that these transfers were not the kind of interference with institutional life to which the Agreement is addressed. Appellants were arraigned on August 27, 1973. Numerous pretrial defense motions were scheduled for hearings during the ensuing months. Trial could not begin until February 1974. In the meantime, both appellants faced pending charges in Pennsylvania. Interference with defense preparation for those trials and with appellants' speedy trial rights would have resulted if they had not been returned to Philadelphia.[101] Furthermore, even if we were to stretch matters and assume appellants were participating in special programs while incarcerated in Philadelphia, it is apparent that more damage to those programs would have ensued had appellants been confined in jails in the Washington, D.C., area for six months awaiting trial than if they were transferred back to their original places of imprisonment. No useful purpose would have been served by holding appellants here.

Article IV(e) has not been a basis for reversal in those cases where its mechanical application would thwart the Agreement's purposes. *See, e. g., Gale v. United States*, D.C.App., 391 A.2d 230 (1978); *United States v. Chico*, 558 F.2d 1047 (2d Cir. 1977); *State v. Sassoon*, 240 Ga. 745, 242 S.E.2d 121 (1978); *Neville v. Friedman, supra.* The policies of the Agreement were served in this case by the "expeditious and orderly disposition of [these] charges." Article I. The purposes of the legislation are beneficial to defendants, and rightly so, but in view of the severity of the sanctions, issues arising from the Agreement should be viewed with circumspection. We conclude appellants are not entitled to dismissal of their indictments.

### VIII.

#### —A—

Appellants Clark and Moody contend they were unlawfully transferred to the District of Columbia for the purpose of appearing in a lineup. On April 27, 1973, the grand jury investigating this case issued subpoenas to Clark and Moody ordering them to appear for lineups to be held on May 3, 1973. Because both were incarcerated in Philadel-

the conditions of his confinement or his eligibility for rehabilitative or other programs." Joint Supplemental Brief for Appellants at 8. He supports this bare assertion with no evidence. Not only was Moody being held pending his trial *de novo*, but he was incarcerated without bond on other serious charges. These circumstances make it unlikely prison officials would have been disposed to grant Moody privileges—regardless of the status of outstanding detainers.

100. The government contends Clark was not serving his sentence while in the Philadelphia Detention Center. *But see Clark v. United States*, 398 F.Supp. 341, 348 (E.D.Pa.1975), *aff'd*, 532 F.2d 745 (3d Cir. 1976). Even if Clark's sentence had technically begun to run on March 20, 1973, when his 1972 conviction was affirmed, he would be required to drop any rehabilitation programs he may have been eligible for on his eventual return to a permanent facility.

101. Clark, in fact, complained in January 1974 that his incarceration in a Baltimore jail was interfering with preparation of his other cases in Philadelphia. He claimed that when he was transferred from Philadelphia to Washington, D.C., he "wasn't told that [he] would be here until trial." Consequently, he requested the court to issue an order sending him back to Philadelphia. There can be no doubt that as to *this* transfer, there was an explicit waiver of the provisions of Article IV(e), *see United States v. Ford, supra.*

phia jails awaiting disposition of other charges, the Chief Judge of the Superior Court issued writs of habeas corpus directing that Clark and Moody be turned over to the U.S. Marshal for transfer to the District. The writs were honored by Philadelphia authorities and Clark and Moody were brought to Washington, D.C. Moody was identified in the lineup by three witnesses; Clark was not identified.

Appellants contend (1) the Superior Court grand jury had no power to subpoena them outside the District of Columbia [102] and (2) the Chief Judge of the Superior Court lacked authority to issue the extraterritorial writ in question. Consequently, appellants argue, the identification evidence obtained as a result of their unlawful transfers should have been excluded at trial. Since Clark was not identified by any witness at the lineup, however, and since we have concluded that Amina Khaalis' in-court identification of him was not the product of an irreparably and unnecessarily suggestive procedure, we find nothing to suppress as a result of Clark's transfer to the District for the purpose of appearing in a lineup. Thus, we address the arguments raised only as they relate to appellant Moody.

The authority of the Superior Court to issue subpoenas is found in Super.Ct.Cr.R. 17 and in D.C.Code 1973, § 11–942. Section 11–942(b) provides:

A subpoena in a criminal case in which a felony is charged may be served at any place within the United States upon order of a judge of the court. [*Accord*, Rule 17(e)(2).]

Moody contends this section was not triggered as no charge had yet been brought, and that a grand jury subpoena extends only within a 25-mile radius of the District. Rule 17(e)(1); D.C.Code 1973, § 11–942(a). We disagree. Section 11–942(b) (and resulting Rule 17(e)(2)) was enacted so that in felony cases, "the Superior Court [would have] the same subpoena power conferred on Federal district courts . . ." H.R. Rep. No. 91–907, 91st Cong., 2d Sess. 138 (1970); *accord*, S.Rep. No. 91–405, 91st Cong., 1st Sess. 24 (1969). Super.Ct.Cr.R. 17(e)(2) is substantially similar to Fed.R. Crim.P. 17(e)(1) which grants federal courts nationwide subpoena power. Federal grand juries derive their subpoena power from federal Rule 17 which contains no territorial limitations. "Rule 17, which governs the subpoena power in criminal proceedings, was clearly intended to apply not only to criminal trials but to grand jury investigations as well." *Bacon v. United States*, 449 F.2d 933, 940 (9th Cir. 1971), citing Advisory Committee Note to Rule 20 (renumbered 17) Federal Rules of Criminal Procedure, Preliminary Draft 107 (1943).

 We conclude, therefore, that the language "in which a felony is charged" was not meant by Congress to deprive Superior Court grand juries investigating felony cases of nationwide subpoena power.[103] The language was included only to differentiate between misdemeanor and felony cases. *Compare* D.C.Code 1973, § 11–942(b), *with* § 23–563 (arrest warrants and summonses issued by the Superior Court in felony cases may be served anywhere in the United States; misdemeanor warrants may be executed only within a 25-mile radius of the District). Superior Court grand juries were intended to have powers comparable to federal grand juries. Support for this view is found also in D.C.Code 1973, § 11–1903, which provides:

---

**102.** We previously have held that a grand jury may subpoena a suspect and direct him to stand in a lineup. *In re Toon*, D.C.App., 364 A.2d 1177 (1976), *cert. denied*, 429 U.S. 1099 (1977). *See also In re Melvin*, 550 F.2d 674 (1st Cir. 1977).

**103.** *Durbin v. United States*, 94 U.S.App.D.C. 415, 221 F.2d 520 (1954), is distinguishable. There, the court held that the word "complaint" in an indictment could not be construed as having "charged" the commission of an offense for purposes of 18 U.S.C. § 1073 (flight to avoid giving testimony). Because the court was dealing with a penal statute, the language was strictly construed. Here, the legislative history of D.C.Code 1973, § 11–942(b), bespeaks a different intent. We should be hesitant to infer that Congress intended to frustrate the grand jury's investigative function by prohibiting the subpoenaing of witnesses whose testimony may be essential to the securing of an indictment.

A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts.

As stated in *Atkinson v. United States*, D.C.App., 295 A.2d 899, 901 (1972): "Everything is identical between both [District and Superior Court] Grand Juries; purpose, standards, functions, powers, qualifications, and rules." [Quoting *United States v. Jackson*, D.C.Super.Ct. (Cr. No. 11050–71, June 15, 1971, at 3).] *See also* Super.Ct.Cr.R. 6 and accompanying Advisory Committee Comment. It is at once apparent that if we were to hold that Superior Court grand juries lack extraterritorial subpoena power, the government could avoid this technical stricture by presenting to District Court grand juries serious felony cases in which witnesses will be needed from other jurisdictions. Once the investigation is completed, the indictment then could be returned in the Superior Court pursuant to § 11–1903. Use of such an artifice could not have been intended by Congress. We conclude the grand jury had the power in this case to direct subpoenas to persons beyond the territorial borders of the District.

■ Since Moody was incarcerated, however, it was necessary for the court to issue a writ commanding Moody's custodian to deliver him. *Neufield v. United States*, 73 U.S.App.D.C. 174, 118 F.2d 375 (1941), *cert. denied*, 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199 (1942). Appellant contends that the Superior Court had no power to issue a writ of habeas corpus directing his presence at a lineup and, in fact, had no authority to issue any extraterritorial writ. We are directed to D.C.Code 1973, § 16–1901, which provides that a person confined *within* the District may petition for a writ of habeas corpus. That statute pertains, however, to only the "Great Writ," the writ of habeas corpus *ad subjiciendum* (inquiry into the cause of restraint). The Great Writ has

been traditionally subject to jurisdictional limitations. *See Carbo v. United States*, 364 U.S. 611, 618, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961); *Ahrens v. Clark*, 335 U.S. 188, 191, 68 S.Ct. 1443, 92 L.Ed.2d 1898 (1948).[104] The writ issued here was procedural in nature and clearly not used to test the legality of appellants' confinement; it is necessary, therefore, to look beyond § 16–1901 for authority of the court to issue the writ in question.

■ The government contends that authority of the Superior Court to issue the writ emanates from 28 U.S.C. § 1651, the All Writs Act. Section 1651(a) provides:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

As is evident, this statute bestows on all courts "established by Act of Congress" the power to issue extraordinary writs. The Superior Court was created by an "Act of Congress" pursuant to Congress' Article I powers. D.C.Code 1973, § 11–101(2). It is established in this jurisdiction that § 1651 applies to the local District of Columbia courts. In *Morrow v. District of Columbia*, 135 U.S.App.D.C. 160, 417 F.2d 728 (1969), the circuit court held that § 1651 was plainly applicable to the District of Columbia Court of Appeals. *See also Citizens Association of Georgetown v. Washington*, D.C. App., 291 A.2d 699, 703 (1972). More recently, in *United States v. Cogdell*, 190 U.S.App.D.C. ——, 585 F.2d 1130 (1978), the court held that the authority of the Superior Court to issue writs of habeas corpus *ad prosquendum* was clearly within the implied powers of § 1651. We also have recognized the Superior Court's power to issue process under § 1651. *See Gredone v. Gredone*, D.C.App., 361 A.2d 176, 180 n. 5 (1976); *Wise v. Murphy*, D.C.App., 275 A.2d 205, 210 (1971) (en banc). The Superior Court may issue writs of habeas corpus in

104. *But see Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) (prisoner's presence in confining jurisdiction no longer an inflexible

prerequisite to federal habeas corpus relief under 28 U.S.C. § 2241, limiting *Ahrens v. Clark*, *supra* ).

"aid of its jurisdiction." [105] We consider next whether the writ issued in this case is an auxiliary writ "agreeable to the usages and principles of law."

The Supreme Court has stated that in determining what writs are "agreeable to the usages and principles of law," resort must be had to the common law. *United States v. Hayman*, 342 U.S. 205, 221 n. 35, 72 S.Ct. 263, 96 L.Ed.2d 232 (1952). There were many common law versions of habeas corpus. [106] Although a writ for the purpose of producing a prisoner for a grand jury lineup was not precisely known in the common law, a writ was frequently used to produce prisoners before the court to testify (writ of habeas corpus *ad testificandum* ). The writ of habeas corpus *ad testificandum* may be issued to bring a prisoner before a grand jury. *United States v. Grunewald*, 164 F.Supp. 640 (1958). *See also Adams v. United States*, 423 F.Supp. 578 (E.D.N.Y. 1976), *aff'd*, 559 F.2d 1202 (2d Cir. 1977). In *Price v. Johnston*, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), the Supreme Court recognized that a court need not be confined to the precise forms of common law writs when issuing a writ pursuant to the All Writs Act. The law is not static, the court noted, and "[t]he historic and great usage of the writ, regardless of its particular form, is to produce the body of a person before a court for whatever purpose might be essential to the proper disposition of a cause." *Id.* at 283, 68 S.Ct. at 1059. Thus, the Supreme Court has upheld writs issued pursuant to this section in order to secure a prisoner's presence in court to argue his case on appeal, *Price v. Johnston, supra*, and to testify or "otherwise prosecute" a motion filed pursuant to 28 U.S.C. § 2255, *United States v. Hayman, supra.* [107] We therefore conclude that the Superior Court may issue a writ in the nature of a writ of habeas corpus *ad testificandum* where it is necessary that a prisoner be produced pursuant to a grand jury subpoena commanding him to appear in a lineup. [108] Issuance of the writ is discretionary, however, and we emphasize that the court must first satisfy itself that the writ is in "necessary" aid of the court's jurisdiction. We conclude the court did not abuse its discretion in this case.

We turn briefly to the next question raised by appellant—whether the writ can

**105.** The Supreme Court has recognized the authority of at least one other Article I court to issue writs pursuant to § 1651. In *Noyd v. Bond*, 395 U.S. 683, 695 n. 7, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631 (1969), the Court stated that "[s]ince the All Writs Act applies by its terms to any 'courts established by Act of Congress', . . . we do not believe that there can be any doubt as to the power of the Court of Military Appeals to issue an emergency writ of habeas corpus . . . ." *See also United States v. Frischolz*, 16 U.S.C.M.A. 150, 36 C.M.R. 306 (1966). The Court of Military Appeals, like the Superior Court is not a "court of the United States," as defined by 28 U.S.C. § 451. Its judges, like those of the Superior Court, do not have life tenure. 10 U.S.C. § 867.

**106.** They are listed in *Price v. Johnston*, 334 U.S. 266, 281, 68 S.Ct. 1049, 92 L.Ed.2d 1356 (1948), as writs of habeas corpus *ad respondendum, ad satisfaciendum, ad prosequendum, ad testificandum, ad deliberandum, ad faciendum*, and the Great Writ, *ad subjiciendum.*

**107.** In *Price v. Johnston*, the writ was authorized by § 272 of the Judicial Code, the precursor to 28 U.S.C. § 1651.

**108.** Appellant asserts the court issued a writ of habeas corpus *ad prosequendum* and since no indictment had been returned, even assuming the authority of the court to issue such writs, an inappropriate writ was used. The record disputes this contention. In its application for a writ of habeas corpus on May 2, 1973, the government entitled its petition "Petition for a Writ of Habeas Corpus." No mention is made of the kind of writ applied for. Similarly, the writ executed on that date does not define the type of writ used. However, it was clear from both the petition and the issued writ that the purpose of the writ was to bring Moody before a *grand jury* lineup. Furthermore, in all the writs issued *after* indictment to transfer Moody, the government clearly applied for writs of habeas corpus *ad prosequendum*; each of its petitions so denotes. Thus, although the writ used here was not specifically entitled a writ of habeas corpus *ad testificandum*, we think it was clearly intended to be of that nature. In any event, the improper designation of a writ is not fatal where the petition adequately discloses the purpose for which the writ is needed. *Gilmore v. United States*, 129 F.2d 199, 202 (10th Cir.), *cert. denied*, 317 U.S. 631, 63 S.Ct. 55, 87 L.Ed. 509 (1942).

issue extraterritorially. In *Carbo v. United States, supra,* the Supreme Court held that writs of habeas corpus *ad prosequendum* were not subject to territorial limitations.[109] It specifically left open the question of the reach of writs *ad testificandum. Id.* at 618 n. 13. The Court there cited *Edgerly v. Kennelly,* 215 F.2d 420 (7th Cir. 1954), a case which had held that *ad testificandum* writs may not issue beyond the territorial borders of the district. This understandably left some doubt as to whether similar writs could be directed to the custodian of a prisoner in another district or state. We note that since *Carbo* was decided, the Seventh Circuit has explicitly overruled *Edgerly v. Kennelly* and held that on its face the writ of habeas corpus *ad testificandum* is as broad as the writ *ad prosequendum* and may be issued extraterritorially. *Stone v. Morris,* 546 F.2d 730, 737 (7th Cir. 1976); *see also Word v. North Carolina,* 406 F.2d 352, 356 n. 5 (4th Cir. 1969); *Gibson v. United States,* 53 F.2d 721 (8th Cir. 1931), *cert. denied,* 285 U.S. 557, 52 S.Ct. 458, 76 L.Ed. 946 (1932); *Ball v. Woods,* 402 F.Supp. 803 (N.D.Ala.1975); *United States v. McGaha,* 205 F.Supp. 949 (E.D.Tenn. 1962). In *Barber v. Page,* 390 U.S. 719, 724, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), the Supreme Court cited *United States v. McGaha, supra,* and simply assumed that a common law writ of habeas corpus *ad testificandum* issued by a state court would have extraterritorial effect.[110] The Fourth Circuit has suggested that *Barber v. Page* renders "insubstantial" any remaining doubts about the reach of the writ *ad testificandum. Word v. North Carolina, supra* at 356 n. 5.[111]

■ We conclude that in *aid of its authorized jurisdiction,* the Superior Court may issue extraterritorial writs. It is elementary that the All Writs Act does not supply or expand the jurisdiction of the court, but serves only to confer power to issue writs where the court's jurisdiction otherwise exists. *Morrow v. District of Columbia, supra.* The authority to issue writs *ad testificandum* extraterritorially has been presumed to be a necessary aid to and coextensive with the court's jurisdiction to issue nationwide subpoenas. *Gibson v. United States, supra* at 722. The power of the federal courts to issue extraterritorial process under Fed.R.Crim.P. 4 and 17 influenced the Supreme Court's decision in *Carbo, supra,* where it held that writs of habeas corpus *ad prosequendum* could be issued extraterritorially. *Id.* at 620.[112] The same rationale extends to the issuance of a writ in the nature of a writ of *ad testificandum* in Superior Court. The court has jurisdiction to issue subpoenas in felony cases outside the District. We conclude the Superior Court properly exercised its authority in this case.[113]

—B—

Clark contends the government improperly used a federal grand jury proceeding in Philadelphia in order to obtain his finger-

**109.** *See also United States v. Cogdell, supra,* where the court upheld the validity of an extraterritorial writ of habeas corpus *ad prosequendum* issued by the Superior Court.

**110.** The court noted that writs issued by state courts are generally honored by the Federal Bureau of Prisons. *Barber v. Page, supra* at 724, 88 S.Ct. 1318.

**111.** *But cf. Clark v. Hendrix,* 397 F.Supp. 966 (N.D.Ga.1975), and cases cited therein. The court in *Clark v. Hendrix* held it had no power, in a *civil* case, to issue the writ of habeas corpus *ad testificandum* extraterritorially. The case is distinguishable, however. First, the court relied on *Edgerly v. Kennelly, supra,* which has since been overruled. Moreover, the court was careful to limit its holding to civil proceedings and expressly recognized that in a

criminal case, it might have authority to issue an extraterritorial writ of habeas corpus *ad testificandum* due to the court's nationwide process under Rule 17.

**112.** *See also Braden v. 30th Judicial Circuit Court of Kentucky, supra* 410 U.S. at 495, 93 S.Ct. at 1130 where the court stated: "So long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' . . . ."

**113.** In view of our disposition of this issue, we need not reach the government's alternative argument that the Superior Court has vestigial common law authority to issue the writ under D.C.Code 1973, § 49–301.

prints and handwriting exemplars and that such evidence and its fruits should have been suppressed at trial. In February and March 1973, three Assistant United States Attorneys for the District of Columbia were appointed special assistants for the Eastern District of Pennsylvania.[114] Their purpose was to assist a federal grand jury in investigating potential violations of federal firearms laws which may have been related to the homicides in Washington, D.C. On March 16, 1973, a grand jury subpoena was issued out of the Eastern District of Pennsylvania to Clark for the purpose of securing his fingerprints and handwriting exemplars. The subpoena was neither specifically requested by the grand jury nor signed by its foreman. That same day, Clark was arrested by local Philadelphia police pursuant to a warrant for an unrelated armed robbery.[115] Following his arrest, Clark was served with the federal grand jury subpoena and also with a court order signed by a judge of the United States District Court for the Eastern District of Pennsylvania ordering him to provide fingerprints and handwriting exemplars.[116] After consulting an attorney, Clark voluntarily complied with the subpoena and court order. The exemplars and fingerprints were never presented to the Philadelphia grand jury, but instead were tendered to the Washington, D.C. grand jury. Clark contends the exemplars and fingerprints were obtained as a result of subterfuge and abuse of the grand jury process because they were neither requested by nor presented to the Philadelphia grand jury but rather were obtained as an independent act of the prosecution solely for use in the investigation of the Hanafi murders in Washington, D.C.

 It is recognized that a grand jury may subpoena a suspect in order to secure his fingerprints and handwriting exemplars. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). Such seizures may not be successfully challenged on either Fourth, Fifth (privilege against self-incrimination), or Sixth (right to counsel) Amendment grounds. *United States v. Dionisio, supra*; *United States v. Mara, supra*; *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The absence of constitutional infirmities does not necessarily preclude a challenge to the subpoena in an enforcement proceeding, however. A subpoena may be resisted where the grand jury acts without authority, where the subpoena seeks information unrelated to the grand jury's investigation, or where the subpoena endeavors to gather evidence *primarily* for another purpose. *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (1973), *aff'd after remand*, 507 F.2d 963 (3d Cir. 1975); *see also United States v. Moultrie*, D.C.App., 340 A.2d 828, 832 n. 2 (1975). The court may exercise its supervisory powers over criminal proceedings if it appears the government is acting in bad faith or in a manner which constitutes a purposeful abuse of the grand jury system. *See In re Melvin*, 546 F.2d 1, 5 (1976), *aff'd after remand*, 550 F.2d 674 (1st Cir. 1977); *Durbin v. United States*, 94 U.S.App.D.C. 415, 221 F.2d 520 (1954) (dictum).

 While we are cognizant that supervisory authority over the grand jury and its processes resides in the courts, we conclude in this case that Clark has voiced his complaints in an untimely manner and in the wrong jurisdiction. The District of Columbia courts have no supervisory power over federal grand jury proceedings in Pennsylvania. Clark makes no claim that

114. The assistants were also in charge of the "Hanafi" investigation in Washington, D.C.

115. There is no contention on appeal this arrest was illegal.

116. The trial court correctly noted that this ex parte court order added nothing to the validity of enforceability of the subpoena. The Third Circuit, under whose supervisory authority these proceedings were held, has announced that if the subpoenaed party refuses to comply, the government must make a minimal showing of relevancy before a court order will be issued enforcing the subpoena under pain of contempt. *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (1973), *aff'd after remand*, 507 F.2d 963 (3d Cir. 1975).

the Philadelphia grand jury was not a properly constituted body. Therefore the proper court in which to have contested the issued subpoena was the District Court for the Eastern District of Pennsylvania. *See United States v. Owens-Corning Fiberglass Corporation*, 271 F.Supp. 561, 566 (1967). The proper method [117] was by a motion to quash, *United States v. Partin*, 522 F.2d 621 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), or by a refusal to comply with the subpoena and a challenge to its validity in a subsequent enforcement proceeding. *In re Grand Jury Proceedings (Schofield), supra.*[118]

## IX.

■ In this case, each of the appellants was convicted of one count of first-degree premeditated murder (D.C.Code 1973, § 22–2401) and one count of first-degree felony murder (D.C.Code 1973, § 22–2401), for each of the seven homicides.[119] At trial, the government's case was based, in part, on the theory that each of the defendants was guilty of seven counts of felony murder by virtue of being an aider and abetter in the burglary and robberies. At the govern-

ment's request, the trial court instructed the jurors that the defendants could be convicted of felony murder if they found that any one of the defendants had committed the homicides in the course of perpetrating the felonies. Appellants claim that because this instruction allowed the jury to convict them on the felony murder counts without finding that the killings were committed "in furtherance" of the felonies, their felony murder convictions must be vacated. We disagree.

■ D.C.Code 1973, § 22–2401, provides:

Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, *or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401 or 22–402, rape, mayhem, robbery, or kidnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree.* [Emphasis added.]

117. We note there is some dispute as to whether an exclusionary rule is a viable remedy for a claim of abuse of process. *Compare United States v. DiGilio*, 538 F.2d 972, 985 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), *with In re Grand Jury Investigation (General Motors Corp.)*, 32 F.R.D. 175, 185 (S.D.N.Y.), *appeal dismissed*, 318 F.2d 533 (2d Cir.), *cert. dismissed*, 375 U.S. 802, 84 S.Ct. 25, 11 L.Ed.2d 37 (1963).

118. Even if it were within our power to fashion a remedy for an alleged abuse of process by which evidence was obtained for use in this trial, it does not appear to us that the prosecutors in this case exceeded their legitimate authority. "The United States Attorney (or one of his assistants) may obtain subpoenas issued in blank . . . , fill in the blanks, and have the witnesses served without consulting the grand jury." *In re Melvin, supra*, 546 F.2d at 5; Fed.R.Crim.P. 17(a). Examination of materials such as fingerprints is, in the first instance, generally performed by investigative agencies, not the grand jury. *See Robert Hawthorne, Inc. v. Director of Internal Revenue*, 406 F.Supp. 1098 (E.D.Pa.1976). There is no requirement that every piece of subpoenaed evidence be presented to the grand jury. *Id.* Nor is there a proscription against the government

using evidence procured in the course of a grand jury investigation in another proceeding. *United States v. Proctor and Gamble*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); *In re Grand Jury Investigation (General Motors Corp.), supra.*

119. Contrary to appellants' assertions, there is no legal obstacle to either indicting or convicting a person of both felony murder and premeditated murder, where those charges arise from a single homicide. *United States v. Mack*, 151 U.S.App.D.C. 162, 166 n. 4, 466 F.2d 333, 337 n. 4, *cert. denied*, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972); *Fuller v. United States*, 132 U.S.App.D.C. 264, 288–89, 407 F.2d 1199, 1223–24 (1968) (en banc), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). *See Blango v. United States*, D.C.App., 373 A.2d 885, 888 (1977). "The offenses are distinct in the sense that they have different elements. One requires that the slaying be done with 'deliberate and premeditated malice,' the other requires that the killing occur in the course of certain enumerated felonies." *Fuller v. United States, supra* at 289, 407 F.2d at 1224 (footnote omitted).

48

Under the statute, any person who kills another while perpetrating or attempting to perpetrate a robbery, or one of the other enumerated felonies, is guilty of first-degree murder. *Coleman v. United States*, 111 U.S.App.D.C. 210, 295 F.2d 555 (1961), *cert. denied*, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962). This is true even if the homicide is neither intended nor foreseeable. *United States v. Branic*, 162 U.S.App. D.C. 10, 13, 495 F.2d 1066, 1069 (1974); *Coleman v. United States, supra* at 214, 295 F.2d at 559.

■ By its terms, however, the first-degree murder statute imposes felony murder liability solely on the person who does the killing. Other participants in the felony are exposed to first-degree murder liability only by virtue of the aiding and abetting statute, D.C.Code 1973, § 22–105.[120] Hence, the felony murder liability of an accomplice must be determined in accordance with common law concepts of vicarious liability.[121] *United States v. Heinlein*, 160 U.S.App.D.C. 157, 167, 490 F.2d 725, 735 (1973).

■ The accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts of another person which are " 'in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.' " *Collazo v. United States*, 90 U.S.App.D.C. 241, 248, 196 F.2d 573, 580, *cert. denied*, 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364 (1952), *quoting Patten v. United States*, 42 App.D.C. 239, 247–49

(1914). Thus, if one of several confederates commits a homicide while engaged in the commission of a felony, all may be found guilty of felony murder, even if the killing is unintentional. *See United States v. Carter*, 144 U.S.App.D.C. 193, 445 F.2d 669 (1971), *cert. denied*, 405 U.S. 932, 92 S.Ct. 988, 30 L.Ed.2d 806 (1972).

■ The felony murder liability of an accomplice is not unlimited, however. Principles of vicarious liability require that the connection between the felony and homicide be more than a mere coincidence of time and place. W. LaFave & A. Scott, Criminal Law § 71 at 554 (1971); 1 R. A. Anderson, Wharton's Criminal Law & Procedure § 252 at 546 (1957). The relationship must be such that the killing can be said to have occurred in the execution of the common scheme or plot. *See, e. g., State v. Schwensen*, 237 Or. 506, 392 P.2d 328, 334 (1964); *People v. Ryan*, 263 N.Y. 298, 189 N.E. 225, 227 (1934). Furthermore, there is no criminal responsibility on the part of an accomplice if the homicide is a fresh and independent product of the killer's mind, outside of, or foreign to the common design. *United States v. Heinlein, supra* at 168, 490 F.2d at 736; *People v. Wood*, 8 N.Y.2d 48, 51–52, 167 N.E.2d 736, 739 (1960); *People v. Sobieskoda*, 235 N.Y. 411, 139 N.E. 558, 559 (1923); Wharton's Criminal Law & Procedure, *supra* at 547. This limitation on the felony murder liability of an accomplice is usually phrased in terms requiring that the killing be "in furtherance of the common design or plan." *See, e. g., People v. Wood, supra; People v. Basile*, 356 Ill. 171, 190

120. As appellants point out, the government was unable to prove which of defendants were principals. It cannot be seriously disputed, however, that at least one of the defendants acted as a principal in the first-degree in killing the victims.

121. Prior to 1940, a killing done in the perpetration of a felony constituted first-degree murder only if done purposely. *See Jordan v. United States*, 66 App.D.C. 309, 311, 87 F.2d 64, 66 (1936), *cert. denied*, 303 U.S. 654 (1938). If the killing were by accident or otherwise, even in the course of a robbery, it was not murder in

the first degree. In 1940, Congress responded to this interpretation of the statute by amending the definition to impose liability upon a person who kills in the perpetration of certain enumerated felonies, including robbery, even if the killing was not done purposely. *Coleman v. United States, supra* at 214, 295 F.2d at 559. Contrary to the government's assertions, however, neither the purpose nor the effect of the 1940 Amendment was to render an accomplice liable for the killing without regard to whether it was done in furtherance of the underlying felony.

N.E. 307, 310 (1934); Wharton's Criminal Law & Procedure, *supra* at 546.

■ In this jurisdiction, the standard jury instruction [122] on the felony murder liability of an accomplice requires that the killing occur in the "course of the felony and in furtherance of the common purpose to commit the felony." In this case, the trial court refused to give the standard instruction. Instead, the court instructed the jury that it could convict the defendants of felony murder if it found that the killings occurred "in the course of the felony." [123] In our view, the court should have included the phrase "in furtherance of the common purpose to commit the felony" in its instruction. That language would have better focused the jurors' attention on the requirement that the killing be causally related to the underlying felony.

■ It is well-settled, however, that the failure of the trial court to give a requested instruction is not reversible error if the instructions actually given inform the jury of the applicable legal principles. *Montgomery v. United States*, D.C.App., 384 A.2d 655, 661 (1978); *United States v. Nance*, 502 F.2d 615, 619–20 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975); *United States v. Bessesen*, 445 F.2d 463, 468 (7th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368 (1971). Here, by instructing the jury that the killing must occur in "the course of the felony," the trial court informed the jury that the connection between the felony and homicide must be more than a coincidence of time and place. Defense counsel was not prevented from arguing to the jury that the killings were

outside the scope of, and foreign to, the original plan or design.

Appellants rely on *United States v. Heinlein, supra,* to support their position. In *Heinlein,* the three defendants had joined together to rape a woman. During the course of the rape, the victim slapped Heinlein in the face. He responded by producing a knife and fatally stabbing her. At trial, the other participants in the rape requested the standard instruction on the felony murder liability of an accomplice, and sought to argue that the killing had been a spontaneous act which was outside the scope of the rape, and not in furtherance thereof. The trial court ruled that even if the killing was a spontaneous act, beyond the scope of the rape, the accomplices would be criminally responsible under the felony murder statute. It therefore refused to allow the accomplices to argue that they should be acquitted if the jury found the slaying to be a spontaneous act, and instructed the jury that it should convict the three men of felony murder if it found that one of them had killed the victim "in the course of the rape."

The circuit court reversed the felony murder convictions of the accomplices. It did so, however, not because the trial court had failed to give the standard instruction, but because, unlike in this case, the court had refused to allow the accomplices to argue that the killing was beyond the scope of the rape. With regard to the instructions, the court specifically noted that "the verbal differences between these two formulations, in terms of practical impact upon the jury, are not very great." *Id.* at 165, 490 F.2d at 733. Nothing in this record suggests that appellants were precluded from arguing that the killings were beyond

---

**122.** Criminal Jury Instructions for the District of Columbia, Instruction 4.22 (2d ed. 1972).

**123.** The court's instruction on the felony murder liability of an accomplice was as follows:

In connection with your consideration of the felony murder counts, ladies and gentlemen, you must consider the rule on aiding and abetting, which I have given to you. If you find that two or more persons, while acting together, whether by conspiracy as

stated in Count One, or otherwise, were perpetrating or were attempting to perpetrate either armed robbery or armed burglary in the first degree, and that one of them *in the course of the felony* kills a human being, both the person who committed the killing and the person who aided and abetted him in the felony are guilty of felony murder. [Emphasis added.]

the scope of, and foreign to, the burglary and robberies. We therefore find their reliance on *Heinlein* to be misplaced.

We conclude that the failure of the trial court to instruct the jury that the slayings must have been committed "in furtherance" of the burglary or robberies was not prejudicial error. The evidence in this case was such that it would be irrational to suggest that the jury might have found the murders to be unforeseeable or spontaneous. Denial of the requested instruction could scarcely have affected the verdict.

Having found no reversible error, we uphold appellants' convictions.

*Affirmed.*

